STATE OF NORTH CAROLINA v. WILLIAM MORGANHERRING

No. 340A95

(Filed 20 August 1999)

**1. Constitutional Law, Federal— effective assistance of counsel—murder and sexual offense charges—guilty plea to sexual offense and withdrawal of insanity notice**

Defendant in a prosecution for first-degree murder and sexual offenses did not demonstrate ineffective assistance of counsel where he withdrew his notice and plea of not guilty by reason of insanity on the first day of trial and announced his intention to plead guilty to the two counts of sexual offense; defendant signed

a Harbison statement in which he authorized and instructed his attorneys to admit that he committed the physical acts alleged in the bills of indictment and to base his defense solely on the absence of mental elements of the crime and to seek to reduce the degree of the offenses; he was examined by the court; and he contended on appeal that he did not realize that a defense of diminished capacity would not affect his being found guilty of first-degree felony murder and that it was improbable that a jury would acquit him of first-degree murder after he admitted his guilt to the concurrent sexual offenses once he abandoned his insanity defense. The evidence as a whole entirely supports the trial court's conclusion that defendant was fully aware of the direct consequences of his plea including the fact that he would in all likelihood be convicted of at least felony murder, that defendant had competent counsel who believed that a defendant who put forth a non-credible defense at the guilt phase would not receive a sympathetic hearing from the jury in the punishment phase, and that defendant had a full opportunity to assess the advantages and disadvantages of pleading guilty to the two counts of second-degree sexual offense. In view of defendant's detailed, tape-recorded confession and other evidence in the case, defendant had no realistic defense to the sexual offense charges and hence no defense to felony murder; furthermore, defendant was subject to application of the felony murder rule by virtue of his robbery of one victim and was also convicted of first-degree murder of both victims on the basis of premeditation and deliberation.

## 2. Jury— first-degree murder—jurors' understanding of life imprisonment

The trial court correctly denied defendant's pretrial motion to question jurors about their understanding of life imprisonment where defense counsel admitted at the pretrial hearing that the statute allowing in capital cases an instruction that a sentence of life imprisonment means life without parole took effect after the crimes in the instant case.

## 3. Jury— parole eligibility—particular juror with family experience—no plain error in seating

There was no plain error in a capital prosecution for first-degree murder in the seating of a prospective juror who stated during voir dire that a man who had shot her uncle was sentenced to life, got out on parole, killed someone else, and after going

STATE v. MORGANHERRING

[350 N.C. 701 (1999)]

back to court killed a jailer, but when asked also stated that she could set that experience aside. Defendant neither challenged the juror for cause nor exercised one of his remaining peremptory challenges, did not request any instruction or admonition regarding parole following her selection as a juror, and there is no evidence which in any way suggests or implies that any juror erroneously considered the issue of parole eligibility.

## 4. Confessions and Incriminating Statements— effect of cocaine binge—prior to arrest—statement admissible

The trial court did not err in a first-degree murder prosecution by admitting defendant's confession where defendant contended that he did not knowingly waive his Fifth and Sixth Amendment rights as a result of a cocaine binge prior to his arrest. There is no evidence in the record that defendant's confession was not voluntary and no evidence to indicate that he was intoxicated or otherwise impaired at the time he made the statements.

## 5. Discovery— written report of expert—not prepared—voir dire prior to testimony

The trial court did not err in a first-degree murder prosecution by ordering that the State could conduct a voir dire of defendant's mental health expert prior to his testimony if the expert failed to provide the State with a report of his findings prior to testifying. Although defendant argued that his expert had not prepared a written report, the court did not order the production of a document that did not exist but ordered that the State would be able to conduct a voir dire if a written report was not produced. Moreover, N.C.G.S. § 15A-905 has been construed as providing for reciprocity when defendant has obtained discovery under N.C.G.S. § 15A-903.

## 6. Constitutional Law— right to counsel—presence at court-ordered psychiatric examination

The trial court did not err in a first-degree murder prosecution by denying defendant's request to have counsel present at a court-ordered psychiatric examination. Two psychiatrists and one psychologist examined defendant at his insistence; while the State raised the possibility of an examination by a State-selected psychiatrist, no court-ordered psychiatric examination occurred because defendant abandoned the insanity defense.

**STATE v. MORGANHERRING**

[350 N.C. 701 (1999)]

### 7. Jury— selection—capital punishment

The trial court did not abuse its discretion during jury selection for a capital first-degree murder prosecution by excusing for cause a juror who stated that she felt her personal beliefs might affect her consideration of the death penalty.

### 8. Evidence— photographs—homicide victims before and after death

The trial court did not err in a first-degree murder prosecution by admitting into evidence photographs of the victims before and after their deaths. It is apparent that the court gave due consideration to the objection and arguments of counsel and made findings that the photographs were relevant, were not repetitive, and were no more gruesome than would be the case in other murders of the same nature. Additionally, the court found that the probative value of the photographs outweighed the danger of any prejudice to defendant.

### 9. Evidence— expert—cross-examination—psychiatrist—familiarity with sources

The trial court did not err in a capital prosecution for first-degree murder in the cross-examination questions the State was allowed to ask the defendant's expert in addictive medicine. Although defendant asserted that the prosecutor improperly injected her own knowledge as to the importance of the treatises relied upon by the witness, the degree of the witness's familiarity with the sources upon which he based his opinion is certainly relevant to the weight and credibility the jury should give the testimony.

### 10. Evidence— expert—cross-examination—defendant's statements

The trial court did not err in a capital prosecution for first-degree murder by allowing the State to challenge the validity of a defense expert's opinion by reminding the jury that defendant had a choice with respect to what he told the expert. Since a mental health expert would have to weigh, assess, and analyze his conversations with a client such as defendant in forming his opinion and then either accept or reject in whole or in part the information received, it was proper for the State to examine the reliability or truth of defendant's statements and the degree of reliance placed upon them by the expert in forming his opinions.

**STATE v. MORGANHERRING**

[350 N.C. 701 (1999)]

**11. Evidence— expert—cross-examination—defendant's memory**

The trial court did not err in a capital prosecution for first-degree murder in allowing the prosecutor's cross-examination of defendant's expert where defendant contended that the prosecutor improperly stated her opinion that defendant's confession indicated that defendant had a good memory and a cognitive thought pattern. The prosecutor's questions were well within the bounds of a proper cross-examination; defendant's expert had stated that defendant's mental state was so afflicted that he could not coherently remember what occurred during the murders and it was proper for the State to attack this conclusion.

**12. Evidence— capital sentencing—written transcript of plea to other crimes**

There was no error in a capital sentencing proceeding where defendant contended that the jury was prevented from considering a guilty plea to sexual offense charges as a nonstatutory mitigating circumstance by the court's denial of his motion to admit the written transcript of the plea. The court had instructed the jury that defendant had changed his plea to guilty on the two charges of second-degree sexual offense and submitted the nonstatutory mitigating circumstance that defendant accepted responsibility for the sex offenses. The denial of the motion to admit the written plea did not preclude the jury from considering the guilty pleas as a mitigating circumstance.

**13. Homicide— first-degree murder—premeditation and deliberation—sufficiency of evidence**

The trial court did not err by submitting to the jury charges of first-degree murder on the basis of premeditation and deliberation where defendant contended that there was insufficient evidence for the jury to find that defendant had the capacity to form a specific intent to kill, but defendant first choked Ms. Pena, then repeatedly slashed and stabbed her; he had the ability immediately after her murder to choose various items from her apartment to sell to purchase cocaine; defendant saw Ms. Lee within a relatively short period and decided to "get her"; he was capable of creating an excuse to trick Mrs. Lee into Ms. Pena's apartment; defendant then began choking her, stopping long enough to force her to perform oral sex; and then defendant choked her again until he killed her.

STATE v. MORGANHERRING

[350 N.C. 701 (1999)]

**14. Criminal Law— automatism—failure to instruct—no error**

The· trial court did not err in a capital prosecution for first-degree murder by failing to instruct the jury on the defense of automatism where the evidence clearly supported the instruction given on voluntary intoxication and the defenses of voluntary intoxication and automatism are fundamentally inconsistent. Additionally, defendant failed to present evidence which would support an instruction on automatism.

**15. Homicide— felony murder—robbery—continuous transaction**

The trial court did not err in a first-degree murder prosecution by instructing the jury that defendant could be found guilty of felony murder if his intent to rob was formed after the murder where the evidence did not tend to establish that robbery was defendant's primary motivation for the killing, but defendant's account of the murder and his actions following the murder indicate that the murder and robbery were part of a continuous transaction.

**16. Evidence— prison reports elicited on cross-examination—no plain error**

There was no plain error in a capital sentencing proceeding where the testimony of defendant's mental health expert on direct examination focused on defendant's inability to control his emotional impulses in and out of prison and confirmed that the source of defendant's temper and aggression was a combination of cocaine and alcohol, and the State on cross-examination read defendant's prison writeups concerning details of his disciplinary reports, medical requests, and special religious requests. It was permissible for the State to ask questions regarding defendant's behavior and temperament in a setting when he was not consuming drugs.

**17. Sentencing— capital sentencing—prison disciplinary reports—admissible**

There was no error in a capital sentencing proceeding where defendant objected to the State asking his mental health expert a question regarding defendant's prison disciplinary reports. The rules of evidence do not apply in sentencing proceedings and any evidence which the court deems relevant to sentence may be introduced. A question as to whether defendant needed to be dis-

ciplined while in prison is relevant to the issue of defendant's temper and, since this evidence tends to rebut defendant's theory that he was aggressive only when consuming cocaine and alcohol, it was also relevant to the State's argument.

**18. Sentencing— capital sentencing—death sentence—not arbitrary**

The record in a capital sentencing proceeding fully supported the aggravating circumstances found by the jury, and there was no indication that the sentences of death in this case were imposed under the influence of passion, prejudice or any other arbitrary factor.

**19. Sentencing— capital sentencing—death sentence—not disproportionate**

A sentence of death in a first-degree murder prosecution was not disproportionate where the case was not substantially similar to any case in which the court has found the death penalty disproportionate and was more similar to cases in which the sentence was found proportionate. A sentence of death has never been found disproportionate where the court found defendant guilty of murdering more than one victim, the finding of premeditation and deliberation indicates a more cold-bloodied and calculated crime, the death penalty has not been found disproportionate in any case where the jury has found three aggravating circumstances, and the death penalty has not been found disproportionate in any case in which the prior violent felony aggravating circumstance was included.

Justices MARTIN and WAINWRIGHT did not participate in the consideration or decision of this case.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of death entered by Hight, J., at the 10 July 1995 Criminal Session of Superior Court, Wake County, upon jury verdicts finding defendant guilty of two counts of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments was allowed by the Supreme Court on 25 February 1997. Heard in the Supreme Court 13 October 1997. On 6 November 1997, the Supreme Court remanded the case to Superior Court, Wake County, for an evidentiary hearing, and the case was recertified to the Supreme Court on 29 January 1999.

STATE v. MORGANHERRING

[350 N.C. 701 (1999)]

*Michael F. Easley, Attorney General, by John G. Barnwell, Assistant Attorney General, for the State.*

*William F.W. Massengale and Marilyn G. Ozer for defendant-appellant.*

LAKE, Justice.

The defendant was indicted on 21 February 1994 for two counts of first-degree murder, one count of crime against nature, and two counts of second-degree sexual offense. Prior to trial, the prosecutor indicated she was not going to proceed on the charge of crime against nature and entered a dismissal on 2 August 1995. Defendant was tried capitally at the 10 July 1995 Criminal Session of Superior Court, Wake County. On 14 July 1995, defendant pled guilty to the two charges of second-degree sexual offense and entered a transcript of the plea. The jury subsequently found defendant guilty of both counts of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. Following a capital sentencing proceeding, the jury recommended sentences of death as to each murder conviction. On 22 July 1995, the trial court sentenced defendant to two separate sentences of death, one for each of the two convictions for first-degree murder, and to two consecutive forty-year sentences, one for each of the two convictions for second-degree sexual offense.

At trial, the State's evidence tended to show that in November 1993 defendant moved from New Jersey to Raleigh, North Carolina, to move in with his half-sister, Stacy Holmes. Defendant lived with his half-sister for almost one month, until she asked him to move out because of his alcohol and cocaine abuse and because defendant was very headstrong and "wouldn't negotiate or listen to other people's opinions." Defendant met his first victim, Ramona Pena, at a bus stop and began living with her after leaving his sister's home. Ms. Pena was disabled by multiple sclerosis. The two lived as roommates, with defendant contributing to the cost of rent and groceries.

During this period, defendant was employed briefly for a temporary service company and then began working for Hockaday Heating and Air. Defendant purchased his work tools through installment deductions from his paychecks. On 20 January 1994, defendant picked up his paycheck and discovered that $87.06 had been deducted to pay off the balance defendant owed on his work tools. As a result, defendant became angry; left work; and spent most of his paycheck on beer, cocaine and a prostitute.

Upon returning to Ms. Pena's apartment, defendant went into the bathroom to finish the cocaine he had purchased. He then sat in the living room with Ms. Pena. Ms. Pena got up and began walking down the hall, and defendant followed her and grabbed her. Defendant began choking her in the hall and then dragged Ms. Pena into the bedroom and continued to choke her. At this point, defendant could not remember the exact sequence of events; however, evidence tended to show that Ms. Pena's hands were tied behind her back, she was stabbed six times in the back, and she suffered lacerations on both sides of her neck as well as her left wrist. An autopsy revealed that Ms. Pena died from the lacerations and stab wounds and that death may have taken from thirty minutes to an hour. After the murder, defendant gathered various items of Ms. Pena's from the apartment, including her checkbook and two credit cards. On 21 January 1994, defendant sold Ms. Pena's property and forged and cashed one of her personal checks to purchase more cocaine. Defendant remained in the apartment most of the next day making phone calls, only leaving to purchase beer and pizza.

On 23 January 1994, defendant saw the second victim, Dyann Lee, walking across the apartment-complex parking lot. Defendant approached Ms. Lee and told her Ms. Pena wanted to talk with her. Ms. Lee followed defendant into Ms. Pena's apartment. After she entered the apartment, Ms. Lee walked down the hall into Ms. Pena's bedroom. Defendant came up behind her and grabbed her in a "choke hold." Defendant released Ms. Lee, forced her to perform oral sex and then choked her again until she became unconscious. After Ms. Lee lost consciousness, defendant sodomized her. An autopsy revealed that Ms. Lee died from asphyxiation. After killing Ms. Lee, defendant stole and then sold both a gold chain Ms. Lee had been wearing and a leather coat of Ms. Pena's to purchase more cocaine.

During the late night hours of 23 January 1994 or the early morning hours of 24 January 1994, defendant made a confessional phone call to a Ms. Barbara Frame, who urged him to turn himself in. Defendant attempted to flag down a passing police car, but his attempt failed. He then called the police. On 24 January 1994, between the hours of 3:00 and 3:30 a.m., James Spears of the Wake County 911 center took a call from defendant, who requested that a police officer pick him up so that defendant could turn himself in for a double murder. When police arrived, defendant walked to the police car and confessed to both murders. On the way to the police station, defendant made voluntary statements concerning his regret for

killing Ms. Pena and Ms. Lee. Defendant also stated the murders were a result of his temper. When officers arrived at the murder scene, they found the two bodies in the back bedroom, as defendant had described. After sifting through garbage in the dumpster, police found a bag that contained personal items and a steak knife from Ms. Pena's apartment.

During questioning, defendant told police:

I was sitting there and she [Ms. Pena] got up to go down the hall and I walked down the hall and I just grabbed her. Started choking her, drug her on into the bedroom and I choked her and choked her and she still seemed like she didn't want to just go out. I don't know if I cut her wrists first or cut her throat. I don't remember the order and the sequence of how, but I know I did it, okay.

Later, when questioned about Ms. Lee and his encounter with her on Sunday afternoon, 23 January 1994, defendant stated:

I saw her walking across over there and looked at her. And I remember what the guy was saying about she being, you know, kind of like, you know, loose and everything, you know. And, uh, something just said get her.

Linwood Harper, a downstairs neighbor, testified that he saw defendant following Ms. Lee up the stairs to Ms. Pena's apartment on 23 January 1994. Harper saw defendant again a few hours later when defendant knocked on his door asking for either a ride or a small loan. Another neighbor of Ms. Pena's, Paqita Taylor, testified that defendant came to her apartment on 23 January 1994, inquiring about how to turn on the stove in Ms. Pena's apartment. Defendant told Ms. Taylor that Ms. Pena was sleeping and that he did not want to wake her.

At trial, defendant presented evidence tending to show that he suffers from "idiosyncratic alcohol intoxication," a condition which causes him to react to even small amounts of alcohol with a total loss of impulse control. Defendant presented evidence at both the guilt and sentencing phases tending to show that he had an extremely abusive and unstable childhood. Testimony also indicated that defendant's family has an extensive history of psychiatric problems. Two experts in clinical forensic psychology and clinical forensic psychiatry testified that defendant has a mixed personality disorder with

antisocial, narcissistic and emotionally unstable features, as well as alcohol and cocaine dependence.

[1] In his first assignment of error, pertaining to his motion for appropriate relief, defendant alleges ineffective assistance of counsel. Defendant, through counsel, submitted a written notice of intent to plead not guilty by reason of insanity pursuant to N.C.G.S. § 15A-959. However, on the first day of the trial, 10 July 1995, defendant withdrew his notice and plea of not guilty by reason of insanity, and instead simply pled not guilty to the murder charges. At this time, defendant also announced his intention to plead guilty to the two counts of sexual offense against Dyann Lee. This change in the theory of defense was memorialized in a *Harbison* statement, which was signed by defendant before two witnesses. *See State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985), *cert. denied*, 476 U.S. 1123, 90 L. Ed. 2d 672 (1986). This document was captioned "Defendant's Consent to Theory of Defense and Admission of All Acts Alleged in Indictments" and stated:

> COMES NOW the undersigned defendant in the above-captioned case who alleges and says that he has authorized and instructed his defense attorneys Randolph Riley and Dan Boyce to admit that he committed the physical acts alleged in the bills of indictment therein and to base his defense solely on the absence of mental elements of the crime including premeditation and deliberation and of the specific intent to kill and on his insanity at the time of the commission of the homicides and to seek thereby to reduce the degree of the offenses from murder in the first degree to second-degree murder or manslaughter or to have him acquitted on the basis of insanity.

Defense counsel explained to the trial court that this document was prepared prior to the withdrawal of the insanity notice and that they did not intend to go forward with the insanity defense. The trial court then closely examined defendant directly regarding his understanding of this statement of the defense theory and his voluntary agreement with it. The trial court specifically focused on the withdrawal of the insanity defense, the admission to the physical acts alleged in the indictments and the lack of mental elements of the crimes as the sole basis of defense. The trial court and defendant engaged in the following colloquy:

> THE COURT: . . . [This statement] says that you have authorized and you have instructed your lawyers to admit that you

committed the physical acts alleged in the bills of indictment, that is to first degree murder of, or of Dyann Lee, Ramona Pena and second degree sexual offenses of Dyann Lee, the two charges there, is that correct?

[DEFENDANT]: Yes, sir.

THE COURT: And that you intend to base your defense solely on the absence of the mental elements of the crime including premeditation and deliberation and the specific intent to kill, is that correct?

[DEFENDANT]: Yes, sir.

THE COURT: And that you are not at this time raising insanity as a defense, is that correct?

[DEFENDANT]: Yes, sir, that's correct.

THE COURT: Now, and you've made this decision based upon talking with your lawyers, is that correct?

[DEFENDANT]: Yes, sir.

THE COURT: And you understand this decision and you are satisfied with it?

[DEFENDANT]: Yes, sir, I am and I do.

THE COURT: And you understand you don't have to do that?

[DEFENDANT]: Yes, sir.

THE COURT: And that any choice that you make about doing that is your choice, and it is the choice only to be made after consulting with your lawyers?

[DEFENDANT]: Yes, sir.

THE COURT: And so this is your choice to do it and nobody is forcing you to do it in anyway?

[DEFENDANT]: No, sir, nobody is forcing me.

THE COURT: And this is what you want to do personally?

[DEFENDANT]: Yes, sir.

Defendant now contends, through his present counsel, that notwithstanding his execution of the *Harbison* statement and the foregoing exchange with the trial court, and specifically his state-

ments of understanding regarding a defense of absence of premeditation and deliberation and intent to kill, he did not realize that a defense of diminished capacity would not affect his being found guilty of first-degree felony murder, and thus he received ineffective assistance of counsel. Defendant argues that it was not fully explained to him or that he did not understand that once he abandoned his insanity defense, under the felony murder rule it was improbable that a jury would acquit him of first-degree murder after he admitted his guilt to the concurrent sexual offenses, since such admission would technically make him guilty of first-degree felony murder. Defendant asserts that, during trial, he believed that despite his plea and admission of all acts alleged in the indictments, he could still be acquitted of first-degree murder. He contends now, through his present counsel, that he did not then understand that the defenses of diminished capacity and involuntary intoxication cannot apply to the felony murder charges because intent in sexual offenses is inferred. *See State v. Boone*, 307 N.C. 198, 297 S.E.2d 585 (1982).

After reviewing defendant's motion for appropriate relief raising this issue, this Court determined that the record on appeal contained insufficient evidence to enable this Court to determine the issue. Therefore, on 6 November 1997, this Court entered an order remanding defendant's motion to Superior Court, Wake County, for an evidentiary hearing. The order stated that the evidentiary hearing would specifically address the following matters:

(1) the withdrawal of defendant's plea of not guilty to the murder charges by reason of insanity, (2) the submission of a stipulation by defendant admitting commission of the physical acts alleged in the bills of indictment and basing defense on absence of mental elements of the crime, (3) the tender of guilty pleas to the sex offenses, (4) the circumstances surrounding these submissions to the trial court, and (5) the defendant's understanding and voluntary tender thereof.

*State v. Morganherring*, 347 N.C. 393, 494 S.E.2d 399 (1997). Additionally, this Court's order directed the trial court to make findings of fact and conclusions of law as to defendant's allegations in his motion for appropriate relief. Following this hearing, the trial court, on 12 June 1998, entered its order, with extensive findings of fact and conclusions of law that defendant had not received ineffective assistance of counsel, again denying defendant's motion for appropriate relief. This order, together with a transcript of the hearing and the

exhibits and documents introduced into evidence, was filed in this Court on 29 January 1999 and is considered an addendum to the record on appeal in this case.

It is now incumbent upon this Court upon review to inquire whether the trial court's "findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court." *State v. Stevens*, 305 N.C. 712, 720, 291 S.E.2d 585, 591 (1982). When there is "an evidentiary hearing for appropriate relief where the judge sits without a jury the moving party has the burden of proving by the preponderance of the evidence every fact to support his motion." *State v. Adcock*, 310 N.C. 1, 37, 310 S.E.2d 587, 608 (1984). Findings of fact "made by the trial court pursuant to hearings on motions for appropriate relief" are binding on appeal if they are supported by competent evidence. *Stevens*, 305 N.C. at 720, 291 S.E.2d at 591.

In its numerous findings of fact, the trial court determined that defense counsel felt that in order to maintain any credibility with the jury with regard to the murder charges, counsel had to minimize the evidence regarding the sexual offenses and turn the jury's attention away from those crimes, as they were "the most repellent aspect of his second murder." The trial court found "that Mr. Riley and Mr. Boyce reasonably concluded that they had to focus the jury's attention instead on evidence tending to show that the murders were not committed with cold-blooded premeditation and deliberation." These findings by the trial court are fully supported by the testimony of defense counsel. Mr. Riley testified that he decided to base the defense on the defendant's traumatic childhood, his history of substance abuse and his abuse of cocaine and alcohol at the time of the murders. Mr. Riley testified:

> My co-counsel and I hoped thereby to focus the jury's attention on what we saw as the causes of [defendant's] rage, as well as on his impulsiveness, and lack of premeditation and deliberation. With this strategy in mind, we prepared, for the trial judge and for the record, a memorialization of "Defendant's Consent to Theory of Defense and Admission of All Acts Alleged in Indictments." . . . The defendant agreed with and accepted this strategy.

With respect to the rationale behind the decision not to proceed with the insanity defense, Mr. Riley testified that sometime between

6 July and 10 July 1995, he and his co-counsel determined, after consultation with the involved psychiatric experts, that they would not be able to credibly employ an insanity defense. Defendant was examined by three psychiatric experts: Dr. Bob Rollins, Dr. Roy Mathew, and Dr. Brad Fisher. Based upon the results of these examinations, Mr. Riley stated that defense counsel abandoned "the insanity [defense] because . . . we didn't have enough credible evidence to support it in a way that would not be embarrassing in front of the jury."

With regard to the pleas entered on the sexual offenses, Mr. Riley testified that he did explain this strategy to defendant. During recross-examination in response to "whether there would be from the evidence any substantial defense that the defendant could assert as to those sex offenses," Mr. Riley stated: "I don't know how to answer that except to say that it was my conclusion that a conviction was inevitable to a high degree of certainty." Further, in support of the trial strategy, Mr. Riley testified:

[T]o have interposed pleas of not guilty and persisted in putting the State to its proof on those charges would, in my opinion, have appeared to be inconsistent in the minds of the jurors with the approach that we wanted them to, to understand the defendant was making to these charges of admitting everything that was overwhelmingly provable and only basing his defense on those things which, as to which there might be some question, some reasonable way of disputing the contentions of the State.

With respect to defense counsel's discussions with defendant about the felony murder rule and defendant's understanding of the legal technicalities thereof, the evidence resulting from the hearing on remand and the *Harbison* theory of defense document itself reflect a sparsity of detail. Felony murder as such is not specifically mentioned in this document. As for the lack of any direct reference to felony murder in the theory of defense document, Mr. Riley testified:

[Y]ou need to understand that there essentially wasn't any defense to felony murder. So there was less, less occasion to discuss it.

Once it was defined and explained to him, I mean, it didn't go away and the evidence didn't change, so there was more of a need

to explain to him what we intended to do with respect to the evidence that we had on his state of mind.

. . . .

Q. And why when you wrote the theory of defense did you not simply put in an effort to avoid the death penalty the defendant authorized his attorney if that is what he was doing?

A. Draftsmanship less than comprehensive is all I can say.

In this regard, co-counsel, Mr. Boyce, testified that there were "numerous conversations" with defendant. Mr. Boyce testified:

The whole focus of defense was always on mental capacity. He made some pretty significant statements to the police about his involvement in the crimes and we knew we could not really overcome them. So we were desperate to save [defendant's] life.

At times [defendant] wanted to live. At times he indicated to us that he would prefer to go ahead and die.

Ultimately, he allowed us to present a defense which could have preserved his life.

We at all times thought the jury would find [him] guilty of the sex crimes. We also thought they would find him guilty of some degree of murder.

My recollection is we went to the Death Penalty Resource Center, had discussions about how to handle the murder aspects of the case and we then went to [defendant] and expressed to him what we had learned by those meetings as well as our own assessment.

I have a vague recollection of having discussions about the different types of murder involved but I cannot recall a specific date and a specific conversation when we discussed felony murder specifically.

In light of this evidence presented at the remand hearing, which was conducted by the same judge who presided at trial, the court made substantial findings of fact and conclusions of law, including the following:

49. That the uncontroverted evidence is that the Defendant called the police to turn himself in after committing the crimes and gave a statement to the police confessing to the crimes.

Additionally, the Defendant spontaneously stated to the District Court judge at the probable cause hearing of this matter that he, the Defendant, was guilty of the murders and was ready to accept a death sentence.

. . . .

83. That in view of the admissible evidence against the Defendant, including his detailed confession to the police and the physical evidence which corresponded to his description of the crimes and the lack of any mental health evidence that the Defendant was insane at the time of the crimes, the attorneys for the Defendant concluded that competent prosecution of the case by the State would easily persuade the jury of the Defendant's guilt beyond a reasonable doubt of the physical acts alleged in the indictments.

84. That Mr. Riley and Mr. Boyce, based on their knowledge and experience as trial attorneys, believed it invariably to be the case that a Defendant who puts forward a non-credible defense in the guilt phase of a trial receives a very unsympathetic hearing from the jury in the punishment phase.

. . . .

88. That the attorneys with whom Mr. Riley and Mr. Boyce talked at the North Carolina Resource Center concurred with this evaluation and the strategy. . . .

. . . .

100. That the "Defendant's Consent to Theory of Defense and Admission of All Acts Alleged in Indictments" document does not incorporate in detail all of the conversations Mr. Riley and Mr. Boyce had with the Defendant nor does it incorporate in detail the Defendant's concurrence with the strategy proposed by Mr. Riley and Mr. Boyce. However, throughout the trial and sentencing hearing of this matter the Defendant authorized Mr. Riley and Mr. Boyce at every stage of the case to file such motions, take such actions, make such arguments and all other such things as Mr. Riley and Mr. Boyce did.

101. That the Defendant appeared to understand what Mr. Riley and Mr. Boyce were proposing to do, the rationale for it, and the consequences both direct and indirect at each step and concurred in each and every decision and recommendation of his

attorneys except as to their recommendation that he, the Defendant, should not testify on his own behalf at the sentencing hearing.

102. That the "Defendant's Consent to Theory of Defense and Admission of All Acts Alleged in Indictments" document in Mr. Riley's opinion could have been expanded so as to better describe the defenses and ramifications the Defendant's lawyers had described to the Defendant.

. . . .

113. That the Defendant understood that in all likelihood he was going to be found guilty of first degree murder and that by this strategy, withdrawing his plea of Not Guilty by Reason of Insanity and pleading guilty to the two sexual offenses, the Defendant was putting himself in the best position possible given the facts, evidence and the law, to avoid being sentenced to death. This was true even though the Defendant had on numerous occasions stated that he wanted to be put to death and it was his attorneys who had persuaded him to let them fight to save his life.

The full record on appeal, including the trial and the hearing on remand, shows: an educated, articulate, strong-willed defendant; reflects the close and frequent communication between defendant and his counsel over a period of many months; and reflects that the trial court observed defendant on numerous occasions prior to trial at pretrial hearings and throughout jury selection, the trial and sentencing phase. The evidence presented at the hearing on remand reflects that, notwithstanding what he now asserts, the defendant understood full well the theory of defense proposed by his attorneys and its probable effect. In one of his letters to his defense counsel, defendant wrote: "Gentlemen, I am growing weary and faltering under the continual anxiety of anticipating the inevitable. It is an undeniable fact that either I am going to get the death penalty or life imprisonment."

In light of the foregoing, we conclude that the trial court's findings of fact are abundantly supported by the evidence and that the findings of fact support the conclusions of law that the defendant understood the theory of defense and the consequences of his plea at the time he pled and that defendant freely, voluntarily and understandingly entered the plea. Specifically, we conclude that, notwithstanding defendant's present legal posture as presented through his post-conviction counsel, the evidence as a whole entirely supports

the trial court's conclusion that defendant "was fully aware of the direct consequences of his plea, including the fact that in all likelihood he would be convicted of first-degree murder under the Felony Murder Rule, at least," and that defendant "had competent counsel and a full opportunity to assess the advantages and disadvantages of pleading guilty to the two counts of second-degree sexual offense."

North Carolina's test for ineffective assistance of counsel is identical to the test under our federal Constitution. *State v. Thomas*, 329 N.C. 423, 438, 407 S.E.2d 141, 151 (1991). In *Thomas*, this Court stated:

> A defendant is entitled to relief if he can show both (1) that his counsel's performance fell below an objective standard of reasonableness, and (2) that his counsel's deficient representation was so serious as to deprive him of a fair trial.

*Id.* at 439, 407 S.E.2d at 151.

In the case *sub judice*, defendant has failed to demonstrate ineffectiveness of counsel under either standard. Clearly, defendant has failed to show that under the circumstances here presented, including the overwhelming evidence of defendant's guilt on all counts, that he was prejudiced to any extent by any deficient performance of counsel. In this regard, this Court has further stated:

> "The question becomes whether a reasonable probability exists that, absent counsel's deficient performance, the result of the proceeding would have been different." [*State v. Moorman*, 320 N.C. 387, 399, 358 S.E.2d 502, 510 (1987).] When a court undertakes to engage in such an analysis, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [*Strickland v. Washington*, 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694 (1984).]

*State v. Mason*, 337 N.C. 165, 177-78, 446 S.E.2d 58, 65 (1994).

In view of defendant's detailed, tape-recorded confession and the other evidence in the case, we conclude that defendant had no realistic defense to the sexual offense charges and hence no defense to

first-degree murder predicated on the felony murder rule. We further note that defendant was subject to application of the felony murder rule by virtue of his robbery of Ms. Pena and that he was also convicted of first-degree murder of both victims on the basis of premeditation and deliberation. This assignment of error is overruled.

[2] In his next assignment of error, defendant contends that the trial court erred in denying his pretrial motion for an instruction on parole eligibility to prospective jurors. Defendant also contends that the trial court committed plain error in failing to admonish a juror as to her concerns and conceptions regarding parole eligibility. We disagree.

Defendant filed a pretrial motion requesting permission to question jurors on their understanding of "life imprisonment without parole." The trial court heard this motion on 3 April 1995. During this hearing, the trial court noted that effective 1 October 1994, the General Assembly amended N.C.G.S. § 15A-2002 to provide that in a capitally tried case, where a sentence of life imprisonment without parole is imposed, the trial judge "shall instruct the jury, in words substantially equivalent to those of this section, that a sentence of life imprisonment means a sentence of life without parole." N.C.G.S. § 15A-2002 (1997). The trial court then asked counsel if the offense predated the change of law. Defense counsel told the judge that the law took effect after the crimes in the instant case occurred and then conceded that the new law did not apply in the instant case. Therefore, the trial court correctly denied defendant's pretrial motion to question the jurors about their understanding of life imprisonment.

[3] Defendant also contends that he was prejudiced by the seating of Ms. Pansy Brannan as a juror. During *voir dire*, Ms. Brannan stated:

> I have had a personal experience. I don't know if it would judge my thinking or not but my uncle was shot when he was 23. The guy was sentenced to life and got out on parole and killed someone else and back in court and killed a jailor. So I wanted to share that. [Crying]

The State then asked Ms. Brannan whether that experience would affect her decision in this case, and Ms. Brannan replied, "I think I can set [that experience] aside."

When defendant's counsel questioned Ms. Brannan as to whether she would be inclined to vote for death if she feared the consequences of parole, the following colloquy occurred:

STATE v. MORGANHERRING

[350 N.C. 701 (1999)]

Q. I mean, what I am wondering—let me be blunt about it. I am just wondering if you would be inclined when it came down to the nub and you saw we have got to recommend life imprisonment or we have got to recommend death but I know that if we recommend life imprisonment maybe this man will escape or maybe sometime there could be a parole or maybe he could be in contact with somebody in prison and hurt somebody else, would that—and your personal experiences cause you to unfairly weigh the issues here?

A. I think if it wasn't for that experience I would have to say no, I could not impose the death penalty because I do not feel like that was right but because of the experience I feel like there could be circumstances where death would be necessary but not always.

Q. But where you are sitting right now you are not inclined toward the death penalty. You don't have—

A. No.

Q. —and certainly there's nothing automatic about it?

A. No.

Q. You think your mind is going to be open and your heart pure, so to speak, about and not having any prejudice against the defendant or sympathy that would sway your decision?

A. Again, I think I would have to go by the judge's guidelines on how that decision would be made. I think I could follow whatever the guideline is.

Defendant neither challenged Ms. Brannan for cause nor exercised one of his two remaining peremptory challenges to remove her from the jury. Additionally, at the conclusion of defendant's examination of Ms. Brannan, counsel for the defendant stated, "[t]he defendant is content." However, defendant now contends that his sentencing hearing was fatally compromised because after Ms. Brannan was selected as a juror, the trial court did not instruct her to not consider the issue of parole in deliberations.

Defendant failed to request any instruction or admonition regarding parole following Ms. Brannan's selection as a juror. Defendant concedes this point. Therefore, we must limit our review to whether

the trial court's failure to admonish Ms. Brannan constitutes plain error. *State v. Campbell*, 340 N.C. 612, 641, 460 S.E.2d 144, 160 (1995), *cert. denied*, 516 U.S. 1128, 133 L. Ed. 2d 871 (1996). "In order to prevail under a plain error analysis, defendant must establish not only that the trial court committed error, but that 'absent the error, the jury probably would have reached a different result.'" *State v. Sierra*, 335 N.C. 753, 761, 440 S.E.2d 791, 796 (1994) (quoting *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993)).

There is no evidence in the record which in any way suggests or infers that Ms. Brannan or any juror erroneously considered the issue of parole eligibility during jury deliberations in the sentencing phase. Ms. Brannan clearly stated that she had no prejudice on this issue, that she could consider both sentencing options and that she would follow the guidelines set out by the trial court. Therefore, we cannot conclude that had the trial court instructed Ms. Brannan not to consider the possibility of parole, defendant would have received a life sentence rather than a sentence of death. This assignment of error is overruled.

[4] In his next assignment of error, defendant argues that he is entitled to a new trial because the trial court failed to suppress his 24 January 1994 confession to the police. Defendant asserts that in order for his confession to be voluntary, he must have been sober or unimpaired when the confession was made. Specifically, he contends that as a result of his cocaine binge prior to his arrest, he did not knowingly waive his Fifth and Sixth Amendment rights.

In this regard, we note that the United States Supreme Court has declined to create a constitutional right for defendants to confess to their crimes "only when totally rational and properly motivated," in the absence of any official coercion by the State. *Colorado v. Connelly*, 479 U.S. 157, 166, 93 L. Ed. 2d 473, 484 (1986). Additionally, the Supreme Court determined that it was more appropriate for state laws governing the admission of evidence to resolve this issue. *Id.* at 167, 93 L. Ed. 2d at 484. Citing *Connelly*, the Supreme Court of North Carolina ruled that "police coercion is a necessary predicate to a determination that a waiver or statement was not given voluntarily," and without police coercion, the question of voluntariness does not arise within the meaning of the Due Process Clause of the Fourteenth Amendment. *State v. McKoy*, 323 N.C. 1, 21-22, 372 S.E.2d 12, 23 (1988), *sentence vacated on other grounds*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990).

There is no evidence in the record to indicate that defendant's confession was not voluntary. Furthermore, defendant fails to identify any evidence that demonstrates or indicates he was intoxicated or otherwise impaired at the time he made the statements. This assignment of error is overruled.

[5] In his next assignment of error, defendant contends that the trial court erred by ordering that if defendant's mental health experts failed to provide the State with a report at the time the expert was called as a witness, the State could conduct a *voir dire* of that expert prior to his testimony to the jury. We disagree.

The State requested the trial court to order defendant's mental health expert to produce a written report of his findings prior to that expert's testifying at trial. Defendant replied that his expert had not prepared a written report but that the expert had sent a one-page letter summarizing his position. On 28 June 1995, the trial court notified defendant that if a written report was not produced, then the State would be able to conduct a *voir dire* of defendant's expert before the presentation of any evidence to the jury by that witness.

Defendant acknowledges that this Court has held that N.C.G.S. § 15A-905 authorizes the trial court to order a defendant to produce a written report of the examination results relied upon or to be used by defendant's expert witness. *See State v. East,* 345 N.C. 535, 545, 481 S.E.2d 652, 659, *cert. denied,* —— U.S. ——, 139 L. Ed. 2d 236 (1997). However, defendant now requests this Court to reconsider its holding in *State v. East* in light of *Wardius v. Oregon,* 412 U.S. 470, 37 L. Ed. 2d 82 (1973). In *Wardius,* the United States Supreme Court held that reciprocal discovery is required by fundamental fairness. *Id.* at 475-76, 37 L. Ed. 2d at 88. Therefore, defendant contends that since he is required to produce a document that does not exist, then the State must be held to the same standard.

This argument is without merit. The trial court did not order the production of a document that did not exist. Rather, the trial court ordered that if a written report was not produced, then the State would be able to conduct a *voir dire.* Moreover, this Court has construed N.C.G.S. § 15A-905 as providing for reciprocity when the defendant has obtained discovery under N.C.G.S. § 15A-903. *State v. East,* 345 N.C. at 545, 481 S.E.2d at 659. This assignment of error is overruled.

[6] Defendant next assigns error to the trial court's denial of defendant's request to have counsel present at a court-ordered examination

by a psychiatrist. Defendant requested that he be allowed to have counsel present during the examination in order to protect his Fifth and Sixth Amendment privileges. Defendant asserts that counsel's presence would be necessary because of his prior repeated spontaneous cries for help, which included inculpatory and prejudicial statements and which were a result of his mental illness.

Defendant's contentions under this assignment of error are moot because no such examination occurred. Two psychiatrists and one psychologist examined defendant, but defendant insisted that these examinations take place. The State raised the possibility of defendant's examination by a State-selected psychiatrist when defendant indicated that he would rely on an insanity defense. However, defendant subsequently abandoned the insanity defense, and no court-ordered psychiatric examination ever occurred. This assignment of error is without merit and is overruled.

[7] In his next assignment of error, defendant argues that the trial court erred in allowing the State's challenge for cause of prospective juror Linda Davenport, who indicated that she might have difficulty voting in favor of a death sentence. We disagree.

In order to determine whether a prospective juror may be excused for cause because of that juror's views on capital punishment, the trial court must consider whether those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985). During *voir dire*, Ms. Davenport indicated that she would be unable to recommend the death penalty for defendant because of emotional and other reasons:

>     Q. As you look across the room at [defendant], that's the man that this jury may be asked to sentence to death. Can you personally do that? It is not an academic question.
>
>     A. No, ma'am.
>
>     Q. And that's fine. And is that based on—you indicated that you had thought quite a lot about the death penalty.
>
>     A. Yes. I am ambivalent. Sometimes I think it is the thing but I can't come down one way or the other and say that I absolutely agree with it.

**STATE v. MORGANHERRING**

[350 N.C. 701 (1999)]

Q. But you, in answer to the question of if those things are found to be true, that you personally could not sentence the man who is sitting over there to die?

A. No.

Q. Is that based on religious feelings or philosophical or just values that you have developed over the years?

A. Probably a little of all of those.

. . . .

A. Well, to be fair to the Court, I won't take up any more of your time, I will say that I could not [sentence defendant to death].

Q. And do you feel comfortable that's your position?

A. Yes.

[PROSECUTOR]: Thank you. Your Honor, based on that I would challenge for cause.

Following the prosecutor's challenge for cause, defendant was permitted to question Ms. Davenport:

Q. Don't you believe that having been given an opportunity to hear all the evidence and weighed that evidence yourself and with the other jurors and having been told by the Court what all the law is to be applied to that evidence in arriving at a choice as to the appropriate penalty, don't you believe you could do that as a good citizen?

A. I believe, I am a fair and unbiased person but when you asked me the question about what I thought about the death penalty, I feel I need to be honest and let you know about that ambivalence but I do believe I could be fair and unbiased.

In view of these answers, the trial court inquired further of Ms. Davenport as follows:

THE COURT: Mrs. Davenport, I just want to get it straight in my mind. What I understand you saying is that—

A. Uh-huh.

THE COURT: —intellectually you can go through the process.

A. Uh-huh.

THE COURT: And that you agree with the process and you are having doubts about whether you can participate in the process, is that correct?

A. Yes.

THE COURT: Now, you are the only judge that we've got as far as determining whether you can participate in the process or not. It would not be fair to the State of North Carolina, it would not be fair to the defendant for you not to be able to participate fully in the process—

A. Right.

THE COURT: —and be a fair and impartial juror for both the State of North Carolina and to [defendant].

A. That's right.

THE COURT: And so what I want to know is as best you can right now to tell me yes or no whether or not you feel that you can participate in this particular trial as a juror and give fair consideration to everything that is presented as you sit right now.

A. I would say no to be fair to everyone to start out.

THE COURT: Well, this Court is going to find that the juror's answers on voir dire concerning her attitude toward the death penalty shows considered contextually that her views on capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and oath and, therefore, the challenge by the State is hereby allowed.

The decision " '[w]hether to allow a challenge for cause in jury selection is . . . ordinarily left to the sound discretion of the trial court which will not be reversed on appeal except for abuse of discretion.' " *State v. Stephens*, 347 N.C. 352, 365, 493 S.E.2d 435, 443 (1997) (quoting *State v. Locklear*, 331 N.C. 239, 247, 415 S.E.2d 726, 731 (1992)), *cert. denied*, —— U.S. ——, 142 L. Ed. 2d 66 (1998). This Court has previously noted that "a prospective juror's bias for or against the death penalty cannot always be proven with unmistakable clarity." *State v. Miller*, 339 N.C. 663, 679, 455 S.E.2d 137, 145, *cert. denied*, 516 U.S. 893, 133 L. Ed. 2d 169 (1995). Therefore, we must defer to the trial court's judgment as to whether the prospective juror could impartially follow the law. *Id.*

In the present case, Ms. Davenport stated that she felt her personal beliefs may affect her consideration of the death penalty for defendant. Ms. Davenport's responses were at best equivocal, and the trial court gave ample opportunity to both sides to explore and elicit her views. Absent an abuse of discretion, it is the trial court's decision as to whether this prospective juror's beliefs would affect her performance as a juror. *State v. Hoffman*, 349 N.C. 167, 175-76, 505 S.E.2d 80, 85 (1998), *cert. denied,* —— U.S. ——, 143 L. Ed. 2d 522 (1999). In light of the questioning and responses here, we cannot conclude that the trial court abused its discretion by excusing prospective juror Davenport. This assignment of error is overruled.

[8] In his next assignment of error, defendant contends that the trial court erred in overruling defendant's objection to the introduction into evidence and publication to the jury of photographs of the victims before and after their deaths. Defendant argues that the photographs inflamed the jurors' passions, and thus were unfairly prejudicial.

In determining whether to admit photographic evidence, the trial court must weigh the probative value of the photographs against the danger of unfair prejudice to defendant. *State v. Goode*, 350 N.C. 247, 258, 512 S.E.2d 414, 421 (1999); N.C.G.S. § 8C-1, Rule 403 (1992). The trial court's ruling on this issue should not be overruled on appeal unless the ruling was " 'manifestly unsupported by reason or [was] so arbitrary that it could not have been the result of a reasoned decision.' " *Goode*, 350 N.C. at 258, 512 S.E.2d at 421 (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)) (alteration in original).

This Court has held that photographs of a murder victim may be introduced into evidence to illustrate the testimony of a witness. *State v. Call*, 349 N.C. 382, 414, 508 S.E.2d 496, 516 (1998); *State v. Holden*, 321 N.C. 125, 140, 362 S.E.2d 513, 524 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). This Court has also previously held that it is not error to admit the photograph of a victim when alive. *State v. Bishop*, 346 N.C. 365, 388, 488 S.E.2d 769, 781 (1997). In this case, it is apparent the trial court gave due consideration to the objection and arguments of counsel and made findings that the photographs were relevant, were not repetitive and were no more gruesome than would be the case in other murders of the same nature. Additionally, the trial court found that the probative value of the photographs outweighed the danger of any prejudice to defendant. This assignment of error is overruled.

[9] In his next assignment of error, defendant contends that the trial court erred in overruling defendant's objections to the State's cross-examination of Dr. Roy Mathew, a Duke psychiatry professor and expert in addictive medicine. Defendant asserts that the prosecutor improperly injected her own knowledge as to the importance of treatises relied upon by the expert witness. Additionally, defendant asserts that during this cross-examination, the prosecutor was allowed, over defendant's objection, to improperly state that defendant had lied to Dr. Mathew and that the prosecutor improperly stated her opinion. Defendant therefore claims that his due process rights under the Fourteenth Amendment were violated.

On cross-examination, the State first questioned Dr. Mathew regarding his familiarity with the sources he used in forming his opinion:

> Q. Now, Dr. Mathew, you used some terms when you were testifying. As best I could I wrote them down. You made a reference one time to DSM?
>
> A. DSM, yes.
>
> Q. And DSM would be the Diagnostic and Statistical Manual of Mental Disorders. I think it is in the fourth edition now, is it not?
>
> A. Yes, it is.
>
> Q. How familiar are you with DSM?
>
> A. Reasonably familiar.
>
> . . . .
>
> A. When I was in private practice diagnosis was not as important as they are right now. The recent changes in health care financing diagnosis have become much more important than what they were years ago.
>
> So at that time, during the DSM-I and DSM-II they were not used as extensively as they are now.
>
> So I would have turned from DSM-II when I was in private practice. I believe that was in the 1970's.

This Court has frequently explored the proper scope of cross-examination of an expert witness, and this Court has consistently stated:

**STATE v. MORGANHERRING**

[350 N.C. 701 (1999)]

North Carolina Rules of Evidence permit broad cross-examination of expert witnesses. N.C.G.S. § 8C-1, Rule 611(b) (1992). The State is permitted to question an expert to obtain further details with regard to his testimony on direct examination, to impeach the witness or attack his credibility, or to elicit new and different evidence relevant to the case as a whole. " 'The largest possible scope should be given,' and 'almost any question' may be put 'to test the value of his testimony.' " 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 42 (3d ed. 1988) (footnotes omitted) (citations omitted).

*State v. Bacon,* 337 N.C. 66, 88, 446 S.E.2d 542, 553 (1994), *cert. denied,* 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995), *quoted in State v. Hipps,* 348 N.C. 377, 409, 501 S.E.2d 625, 644 (1998), *cert. denied,* —— U.S. ——, 143 L. Ed. 2d 114 (1999). The degree of Dr. Mathew's familiarity with the sources upon which he based his opinion is certainly relevant as to the weight and credibility the jury should give to Dr. Mathew's testimony. The State's questions in this regard were proper.

[10] Defendant next argues that the State improperly accused defendant of lying to Dr. Mathew, as the State challenged the validity of the expert's opinion:

Q. So to the extent that the defendant lied to you or intentionally misled—

[DEFENDANT]: Objection.

THE COURT: Overruled.

Q. To the extent that the defendant lied to you—

[DEFENDANT]: Objection. You are not objecting.

THE COURT: You may continue.

[DEFENDANT]: If you are not going to object, I am. That's the Supreme Court. I am going to object on my own. The Constitution will holdup [sic] that. I will take it all the way up.

THE COURT: Objection is noted for the record. You may continue.

Q. To the extent the defendant lied to you or intentionally misled you and you were not able to verify that and may not know that right now then there might be some information like

that that would make your opinion not as accurate as if you had accurate information?

A. Yes.

In forming an opinion in circumstances such as this, a mental health expert necessarily must weigh and assess information obtained from his interviews with a client such as defendant. Here, the State was attempting to impeach the credibility of Dr. Mathew's testimony by reminding the jury that defendant had a choice with respect to what he decided to tell the expert. Since a mental health expert such as Dr. Mathew would have to weigh, assess and analyze his conversations with a client such as defendant in forming his opinion and then either accept or reject in whole or in part the information received, it was proper for the State to examine the reliability or truth of defendant's statements and the degree of reliance placed upon them by the expert witness in forming his opinions.

[11] Finally, part of defendant's expert's testimony concerned the fact that defendant claimed not to remember anything about the crimes. Defendant contends that the prosecutor improperly stated her opinion that defendant's confession indicated that defendant had a good memory and a cognitive thought pattern:

Q. Well, Dr. Mathew, you were here yesterday when the defendant's statement was played and you heard his voice in this courtroom?

A. Yes.

Q. And that was played, and that tape was made at 6:35 a.m. on Monday morning, January the 24th, '94?

A. Yes.

Q. Right when he was in the middle or toward the end of the four day delirium intoxication, very unique individual, craziness or whatever it is, correct?

A. Correct.

. . . .

Q. . . . I was asking you about the defendant's voice itself on that tape player in this courtroom. Because I grant you that sometime transcribing something from a tape down on paper can be difficult. And on that tape that was played yesterday his memory

apparently was good enough that morning when he met with the doctor, with the police he said that he remembered going back in and looking at Ramona's body and saying to himself, what have you done. You've [f—ked] up now. This state has the [f—king] death penalty.

Now, that sounds like a pretty rational, cognitive, reality thought that I've killed somebody in a state, I've committed a crime, not an accident, in a state and recognizing that particular state, how ever he came to have that knowledge, has capital punishment.

[DEFENSE COUNSEL]: Objection.

Q. Isn't that true?

THE COURT: Overruled.

Again, under the broad standard that this Court allows for the cross-examination of an expert witness, we conclude that the prosecutor's questions were well within the bounds of a proper cross-examination. Defendant's expert had stated that defendant's mental state was so afflicted that he could not coherently remember what occurred during the murders. It was proper for the State to attack this conclusion in order to impeach the expert witness and his opinion. *See Hipps*, 348 N.C. at 409, 501 S.E.2d at 644. Accordingly, the trial court did not err in overruling defendant's objection to the State's question. This assignment of error is overruled.

[12] Defendant contends in his next assignment of error that the trial court erred in denying defendant's motion to admit his written transcript of plea in the sentencing hearing. At the conclusion of the guilt phase, the trial court did not admit into evidence, or publish to the jury, the defendant's written transcript of plea regarding the two counts of sexual offense with which defendant was charged. Defendant contends this ruling prevented the jury from considering defendant's guilty plea as to these offenses as a nonstatutory mitigating circumstance and thus violated the standard set out in *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973 (1978).

In *Lockett*, the United States Supreme Court required that the jury not be precluded from considering any mitigating circumstance. *Id.* at 604, 57 L. Ed. 2d at 990. In the instant case, the record reveals that defendant requested the trial court to inform the jury as to defendant's change in plea. The trial court granted defendant's request and

instructed the jury that the defendant changed his plea to "guilty on the two charges of second-degree sexual offense and that the State is now proceeding on the two charges of first-degree murder." During the sentencing phase, the trial court submitted to the jury two statutory and twenty-seven nonstatutory mitigating circumstances as to both murders. One of these twenty-seven nonstatutory mitigating circumstances was that defendant "accepted responsibility for the sex offenses." Therefore, the trial court's denial of defendant's motion to admit the written plea did not preclude the jury from considering the defendant's guilty pleas to the sexual offenses as a mitigating circumstance. This assignment of error is overruled.

[13] In his next assignment of error, defendant contends that the trial court erred in submitting the charge of first-degree murder of Ms. Pena on the basis of premeditation and deliberation and under the felony murder rule. Specifically, defendant contends that there was insufficient evidence for the jury to find that defendant had the capacity to form a specific intent to kill. Defendant also contends here that the trial court erred in failing to notify the State that it could not proceed on the theory of felony murder for the killing of Ms. Pena since there was no causal or transactional relationship between defendant's fit of anger which led to Ms. Pena's murder and the subsequent appropriation of Ms. Pena's property. This contention is duplicative of defendant's twelfth assignment of error, and we will consider this argument at that point.

With regard to defendant's capacity to form a specific intent to kill, we note first that at the close of the State's evidence, defendant made a motion to dismiss all the charges on the grounds that there was insufficient evidence for the jury to find every element of the charged offenses. This motion was denied, and defendant proceeded to put on evidence in defense. Defendant's motion to dismiss was waived by his decision to put on evidence. N.C. R. App. P. 10(b)(3); *State v. Elliott*, 69 N.C. App. 89, 316 S.E.2d 632, *appeal dismissed and disc. rev. denied*, 311 N.C. 765, 321 S.E.2d 148 (1984). However, defendant preserved this error for review by making a motion to dismiss at the close of all the evidence. *See* N.C.G.S. § 15A-1227 (1997).

The evidence of defendant's actions surrounding the two murders tended to show that he had the capacity to form the specific intent to kill. After first choking Ms. Pena, defendant repeatedly slashed and stabbed her. Immediately after Ms. Pena's murder, defendant had the ability to pick out various property items from Ms. Pena's apartment

in order to sell them to purchase cocaine. Thereafter, within a relatively short period, defendant saw Ms. Lee and decided to "get her." Defendant was capable of creating an excuse to trick Ms. Lee into Ms. Pena's apartment. After Ms. Lee entered the apartment, defendant began choking her; however, defendant did stop choking her long enough to force her to perform oral sex on him. Defendant then choked Ms. Lee again until he killed her. We, therefore, conclude that there was sufficient evidence for a jury to find that defendant had the capacity to form the specific intent to kill. Accordingly, the trial court did not err in submitting the charge of first-degree murder based on premeditation and deliberation. This assignment of error is overruled.

[14] Defendant next assigns error to the trial court's failure to instruct the jury on the defense of automatism. During the charge conference in the guilt phase of the trial, defendant requested the trial court to instruct the jury on the defense of voluntary intoxication and on the defense of automatism. The trial court granted defendant's request as to the instruction for voluntary intoxication but denied defendant's request as to automatism.

When a defendant requests an instruction for voluntary intoxication, he essentially concedes that he was in control of his physical actions but submits that his reason was so " 'overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill.' " *State v. Boyd*, 343 N.C. 699, 713, 473 S.E.2d 327, 334 (1996) (quoting *State v. Mash*, 323 N.C. 339, 346, 372 S.E.2d 532, 536 (1988)), *cert. denied*, 519 U.S. 1096, 136 L. Ed. 2d 722 (1997). On the other hand, the rule for automatism is that " 'where a person commits an act without being conscious thereof, the act is not a criminal act even though it would be a crime if it had been committed by a person who was conscious.' " *State v. Fisher*, 336 N.C. 684, 705, 445 S.E.2d 866, 877 (1994) (quoting *State v. Jerrett*, 309 N.C. 239, 264, 307 S.E.2d 339, 353 (1983)), *cert. denied*, 513 U.S. 1098, 130 L. Ed. 2d 665 (1995). The defenses of voluntary intoxication and automatism are fundamentally inconsistent, and this Court has stated that "unconsciousness as a result of voluntary ingestion of alcohol or drugs will not warrant the instruction [for automatism] requested here by defendant." *Fisher*, 336 N.C. at 705, 445 S.E.2d at 877.

Even though defendant claims not to remember all of his actions during the murders, there is no evidence in the record which indicates that defendant was either unconscious or not conscious of his

actions. For example, immediately after killing Ms. Pena, defendant gathered up several items of Ms. Pena's property with the intent to sell them. Defendant was also able to describe in detail his activities on the days between the murders and the immediate events surrounding Ms. Lee's murder. Furthermore, defendant presented a substantial amount of evidence concerning the amount of alcohol and cocaine he voluntarily ingested. Defendant's own evidence tended to show that he had consumed two forty-ounce containers of beer and smoked about eighty to ninety dollars' worth of crack cocaine in the period surrounding the two murders. This evidence clearly supports an instruction on voluntary intoxication, and the trial court correctly instructed the jury as to this defense. Additionally, because defendant failed to present evidence which would support an instruction on automatism, the trial court did not err in refusing to instruct the jury as to that defense. This assignment of error is overruled.

[15] In his next assignment of error, defendant contends that the trial court erred by instructing the jury that defendant could be found guilty of felony murder if, among other elements, defendant's intent to rob was formed after the murder. Defendant recognizes that the trial court's instruction is consistent with this Court's ruling in *State v. Handy*, 331 N.C. 515, 419 S.E.2d 545 (1992), where this Court held:

> Where there is a continuous transaction, the temporal order of the killing and the taking is immaterial. Provided that the theft and the killing are aspects of a single transaction, it is immaterial whether the intent to commit the theft was formed before or after the killing.

*Id.* at 528, 419 S.E.2d at 552-53. Defendant requests this Court to reconsider the *Handy* rule in light of the specific facts of this case.

Here, the evidence does not tend to establish that robbery was defendant's primary motivation for the killing. Defendant's motive appears to have been frustration, embarrassment or rage. The evidence in this case shows that defendant was frustrated with having quickly squandered $108.00 in wages on cocaine and a prostitute. Defendant's account of Ms. Pena's murder and his actions following the murder indicate that the murder and robbery were all part of the same continuous transaction. In his confession to the police on 24 January 1994, defendant described the events leading up to Ms. Pena's murder as he answered the officer's questions:

A. I said, well, I got to go in and face this woman and I went in. I just said, "Ah, sh—." And I didn't, like, think of doing anything like that or plan it. And I had one more small [amount of crack cocaine], you know, like a piece of it. I went in the bathroom and did it and came back out and I was sitting there and she got up to go down the hall and I walked down the hall and I just grabbed her. Started choking her, drug her on into the bedroom and I choked her and choked her and she still seemed like she didn't want to just go out. I don't know if I cut her wrists first or cut her throat. I don't remember the order and the sequence of how, but I know I did it, okay.

Q. Okay.

A. I mean, you know, and it was weird. Like, I could see with my, you know, eyes that I'm doing it, but something inside of me saying, what are you doing, hold on, wait a minute. It was like, you know, and then it was like I couldn't stop, so, you know, I don't know. I don't really fully understand it all, but . . . So, and then I went all through the apartment, stacked up all the stuff. She had one of those real modern TV's with the VCR. You see a lot of stuff is missing, over there in the racks, a bunch of video tapes, you know, top name movies, CD's the CD player, the stereo system, and uh, I don't know, just a checkbook. Found the two credit cards. Found about seventeen, eighteen dollars in cash. So, and bagged the stuff up. And what did I do? I think I asked the guy downstairs for a ride. I says, "I got to go over to my sister's on Poole Road. Run me over on to Poole Road." And, uh, he said, "Well, I ain't got no gas or nothin'." And I said, "Well, I ain't got no money for gas." Cause now I'm in this advantage, getting this cocaine, so I ain't giving up no money even though I got all this stuff here. . . .

Well, anyway, I think he rode me over. No, he went over next door somewhere, one of his buddies and borrowed like two or three bucks to put some gas in it. And while he was over at the next room, directly across from us, as you come out the door at 3901 directly over, I don't know what number that one is, I kind of loaded the stuff up in the back bed of his pickup, so that he wouldn't, you know . . . But I had these travel bags and luggage bags. Didn't take the television that night, because I figured that would be too obvious, have him drop me right there at Woodpecker, not at my sister's. I went over this lady's house and

told her, you know, "Look I'm moving, and, you know, and leaving and I want to sell all this stuff, you know." She says, "Wow! You know, da da da . . ." So somebody came by to see her and she got him to ride me around and sold it.

This Court has reaffirmed the rule set out in N.C.G.S. § 14-17:

"[A] killing is committed in the perpetration of armed robbery when there is no break in the chain of events between the taking of the victim's property and the force causing the victim's death, so that the taking and the homicide are part of the same series of events, forming one continuous transaction."

*State v. Braxton*, 344 N.C. 702, 713, 477 S.E.2d 172, 178 (1996) (quoting *Handy*, 331 N.C. at 529, 419 S.E.2d at 552).

A reasonable juror could infer from this evidence that defendant's murder and subsequent robbery of Ms. Pena were all part of one continuous transaction. The trial court's instructions to the jury on this issue were supported by the evidence. This assignment of error is overruled.

[16] In his final assignment of error, defendant contends that the trial court erred in permitting the State to cross-examine defendant's mental health expert during the trial's sentencing phase. During the sentencing phase of trial, defendant called Dr. Brad Fisher, an expert in the field of clinical forensic psychology. Dr. Fisher's testimony focused on defendant's inability to control his emotional impulses in and out of prison. During the State's cross-examination of Dr. Fisher, the trial court permitted the State to read defendant's prison write-ups concerning the details of his disciplinary reports, medical requests and special religious requests. Defendant argues that the record does not indicate that the State was trying to discredit defendant's expert witness. Defendant contends that as a result of this cross-examination, the jury believed that if defendant did not get the death penalty, he would continue to ask for special prison favors, harass prison guards and inmates, and file complaints against the prison.

However, defendant made only one objection during the State's cross-examination of Dr. Fisher. Defendant concedes that his other complaints concerning the State's cross-examination under this assignment of error should be reviewed by this Court under the plain error rule. This Court has previously defined the plain error standard of review:

Plain error includes error that is a fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done; or grave error that amounts to a denial of a fundamental right of the accused; or error that has resulted in a miscarriage of justice or in the denial to appellant of a fair trial.

*State v. Gregory*, 342 N.C. 580, 586, 467 S.E.2d 28, 32 (1996).

Assuming *arguendo* that the State's cross-examination of Dr. Fisher elicited inadmissible evidence, we hold that such evidence did not rise to the level of plain error. At sentencing, defendant's counsel focused on the argument that defendant was less culpable for the murders than would otherwise be the case because defendant's rage was the product of the cocaine and alcohol. During direct examination, Dr. Fisher confirmed that the source of defendant's temper and aggression was the combination of cocaine and alcohol he consumed. Dr. Fisher also stated that he agreed with "Dr. Mathew's observation that the defendant is addicted to alcohol" and that defendant is "addicted to cocaine."

Since defendant elicited this evidence during direct examination, it was permissible for the State to ask questions regarding defendant's behavior and temperament in a setting when defendant was not consuming drugs. Defendant can show no prejudice here.

**[17]** Defendant did make one objection during the cross-examination of Dr. Fisher when the State asked a question regarding defendant's prison disciplinary reports. In *State v. Holden*, 346 N.C. 404, 488 S.E.2d 514 (1997), *cert. denied*, —— U.S. ——, 140 L. Ed. 2d 132 (1998), this Court stated:

"The Rules of Evidence do not apply in sentencing proceedings. N.C.G.S. § 8C-1, Rule 1101(b)(3) (1992). Any evidence the court 'deems relevant to sentence' may be introduced at this stage." *State v. Daughtry*, 340 N.C. 488, 517, 459 S.E.2d 747, 762 (1995), *cert. denied*, [516] U.S. [1079], 133 L. Ed. 2d 739 (1996); *accord* N.C.G.S. § 15A-2000(a)(3) (1988) (amended 1994). During a capital sentencing proceeding, the State must be permitted to present any competent evidence supporting the imposition of the death penalty. *Daughtry*, 340 N.C. at 517, 459 S.E.2d at 762.

*Holden*, 346 N.C. at 418-19, 488 S.E.2d at 521. A question as to whether defendant needed to be disciplined while in prison is relevant to the issue of defendant's temper. This evidence also refutes defendant's argument that he is aggressive only when consuming

alcohol and cocaine. Since this evidence tends to rebut defendant's main theory of defense, it is also relevant to the State's argument during sentencing. This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises eight additional issues which he concedes have been decided contrary to his position previously by this Court: (1) the North Carolina death penalty statute is unconstitutional; (2) the trial court erred in denying defendant's motion for a bifurcated jury; (3) the trial court erred in denying defendant's request for individual *voir dire*; (4) the trial court erred in denying defendant's request for a bill of particulars; (5) the statutory aggravating circumstance in N.C.G.S. § 15A-2000(e)(9), that the murder was especially heinous, atrocious, or cruel, is unconstitutionally vague and misapplied; (6) the pattern jury instructions are so confusing that jurors are apt to believe that unanimity is required for a verdict of life imprisonment; (7) the trial court erred by instructing the jury that it had a duty to recommend the death sentence if it answered "yes" to issue four; and (8) the trial court erred by failing to give a peremptory instruction *ex mero motu* for defendant's nonstatutory mitigating circumstances.

Defendant raises these issues for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving them for possible further judicial review of this case. We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY REVIEW

[18] Having concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, we must now review the record and determine as to each murder: (1) whether the evidence supports the aggravating circumstances found by the jury and upon which the sentencing court based its sentence of death; (2) whether the sentence was entered under the influence of passion, prejudice or any other arbitrary factor; and (3) whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). We have thoroughly reviewed the record, transcript and briefs in this case. We conclude that the record fully supports the aggravating circumstances found by the jury. Further, we find no indication that the sentences of death in this case were imposed under the influence of

passion, prejudice or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

**[19]** In the present case, defendant was found guilty of two counts of murder under the theories of premeditation and deliberation and felony murder. Following a capital sentencing proceeding, the jury found three aggravating circumstances submitted as to each murder: that (i) defendant had been previously convicted of a felony involving the use of violence to the person, N.C.G.S. § 15A-2000(e)(3); (ii) the murder was committed while defendant was engaged in the commission of a robbery, N.C.G.S. § 15A-2000(e)(5); and (iii) the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9).

The trial court submitted and the jury found, as to each murder, two statutory mitigating circumstances: (i) the murder was committed while defendant was mentally or emotionally disturbed, N.C.G.S. § 15A-2000(f)(2); and (ii) the defendant's capacity to appreciate the criminality of or to conform his conduct to the law was impaired, N.C.G.S. § 15A-2000(f)(6). The trial court also submitted the statutory "catchall" circumstance, but the jury did not find "[a]ny other circumstance arising from the evidence which the jury deems to have mitigating value." N.C.G.S. § 15A-2000(f)(9). Of the twenty-seven nonstatutory mitigating circumstances submitted as to each murder, the jury found thirteen to exist.

One purpose of our proportionality review is to "eliminate the possibility that a sentence of death was imposed by the action of an aberrant jury." *State v. Lee,* 335 N.C. 244, 294, 439 S.E.2d 547, 573, *cert. denied,* 513 U.S. 891, 130 L. Ed. 2d 162 (1994). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield,* 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). In conducting proportionality review, we compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum,* 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied,* 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). This Court has found the death penalty disproportionate in seven cases: *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines,* 345 N.C. 647, 483 S.E.2d 396, *cert. denied,* 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985);

*State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. First, defendant was convicted of two counts of first-degree murder. This Court has never found the sentence of death disproportionate in a case where the jury has found defendant guilty of murdering more than one victim. *State v. Goode,* 341 N.C. 513, 552, 461 S.E.2d 631, 654 (1995). In addition, the jury convicted defendant under the theory of premeditation and deliberation. This Court has stated that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis,* 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds,* 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). The jury in this case also found all three of the aggravating circumstances submitted. This Court has not found the death penalty disproportionate in any case where the jury has found three aggravating circumstances. *State v. Trull,* 349 N.C. 428, 458, 509 S.E.2d 178, 198 (1998). Finally, in none of the cases in which the death penalty was found to be disproportionate was the (e)(3) aggravating circumstance included. *State v. Lyons,* 343 N.C. 1, 27-28, 468 S.E.2d 204, 217, *cert. denied,* 519 U.S. 894, 136 L. Ed. 2d 167 (1996). " 'The jury's finding of the prior conviction of a violent felony aggravating circumstance is significant in finding a death sentence proportionate.' " *Trull,* 349 N.C. at 458-59, 509 S.E.2d at 198 (quoting *Lyons,* 343 N.C. at 27, 468 S.E.2d at 217).

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum,* 334 N.C. at 244, 433 S.E.2d at 164. Although this Court reviews all of the cases in the pool when engaging in our duty of proportionality review, we have repeatedly stated that "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* It suffices to say here that we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence of death disproportionate or to those in which juries have consistently returned recommendations of life imprisonment.

Finally, this Court has noted that similarity of cases is not the last word on the subject of proportionality. *State v. Daniels,* 337 N.C. 243, 287, 446 S.E.2d 298, 325 (1994), *cert. denied,* 513 U.S. 1135, 130

L. Ed. 2d 895 (1995). Similarity "merely serves as an initial point of inquiry." *Id.* Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

Based on the foregoing and the entire record in this case, we cannot conclude as a matter of law that the sentences of death were excessive or disproportionate. We hold that defendant received a fair trial and capital sentencing proceeding, free of prejudicial error.

NO ERROR.

Justices MARTIN and WAINWRIGHT did not participate in the consideration or decision of this case.