IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-205

Filed: 20 October 2020

Lee County, Nos. 96 CRS 1672-73

STATE OF NORTH CAROLINA

v.

UTARIS MANDRELL REID, Defendant.

Appeal by the State from order entered 7 December 2018 by Judge C. Winston Gilchrist in Lee County Superior Court. Heard in the Court of Appeals 15 October 2019.

*Attorney General Joshua H. Stein, by Assistant Attorney General Mary Carla Babb, for the State.*

*North Carolina Prisoner Legal Services, Inc., by Lauren E. Miller, for the defendant.*

BERGER, Judge.

On July 24, 1997, Utaris Mandrell Reid ("Defendant") was found guilty of first-degree murder and common law robbery. Defendant appealed his conviction and argued that the trial court erred when it denied his motion to suppress his confession to murdering and robbing John Graham. In an unpublished opinion filed on October 19, 1999, this Court upheld Defendant's conviction and determined that the trial court did not err when it denied Defendant's motion to suppress. *State v. Reid*, No. COA98-1392, 135 N.C. App. 385, 528 S.E.2d 75 (N.C. Ct. App. Oct. 19, 1999) (unpublished).

Defendant has since filed a series of post-conviction motions, including this motion for appropriate relief pursuant to N.C. Gen. Stat. § 15A-1415. On December 7, 2018, the trial court granted Defendant's motion for appropriate relief and vacated Defendant's conviction on the grounds of newly discovered evidence pursuant to N.C. Gen. Stat. § 15A-1415(c), and a violation of Defendant's due process rights.

The State appeals, arguing that the trial court (1) erred when it determined that Defendant's confession was a "purported confession;" (2) abused its discretion when it granted Defendant a new trial; and (3) erred when it determined that Defendant's due process rights would be violated if he were not allowed to present the new evidence at a new trial. We agree and reverse the decision of the trial court.

Factual and Procedural Background

On September 30, 1996, the trial court made the following relevant findings of fact related to Defendant's motion to suppress:

> 1. On October 21,1995, Mr. John Graham, a 69 year old black male, was operating a cab for Service Cab Company. At approximately 7:15 p.m. on the above date, Officer Baca of the Sanford Police Department received a call to Humber Street in reference to an assault. He found Mr. Graham lying on his back approximately 20 feet from his vehicle. Mr. Graham had facial injuries that were visible to Officer Baca. Mr. Graham told the officer that he had been assaulted by young black males who had ridden in his cab. Due to Mr. Graham's physical condition, the officers were not able to get very much information from him concerning the identity of the black males who had assaulted him.

2.    On December 17, 1995, Mr. Graham died as a result of complications from the injuries he sustained during the assault on October 21, 1995. He was never physically able to assist in identifying his attackers.

3.    Detective Jim Eads of the Sanford Police Department was assigned to investigate the October 21, 1995 attack on Mr. Graham. Detective Eads at that time had ten (10) years of experience as a detective with the Sanford Police Department. On December 20, 1995, Detective Eads went to the residence of the defendant's grandparents in order to speak with the defendant. Detective Eads spoke with the defendant's grandfather and told him he needed to speak with the defendant at the police department for 15 to 20 minutes. The defendant then accompanied Detective Eads to the police department.

4.    Upon arrival at the police department, Detective Eads and the defendant went to one of the interrogation rooms in the detective division. At approximately 4:19 p.m., Detective Eads advised the defendant of his Miranda Rights using State's Exhibit 1. Detective Eads read each right of the Miranda Warning to the defendant. After reading each right to the defendant, Detective Eads told the defendant to place his initials by the right indicating he understood that right. The defendant initialed each right. Detective Eads then read the Waiver of Rights at the bottom of State's Exhibit 1 to the defendant and asked the defendant to sign at the bottom of the waiver if he understood the waiver and wanted to talk to Detective Eads. The defendant signed the Waiver of Rights.

5.    During the rights warning, the defendant and Detective Eads were alone. Detective Eads had no problems communicating with the defendant. The defendant was very attentive during the process. He did not stutter.

6.    After the rights advisement and waiver, Detective Eads told the defendant that he was investigating the

assault on Mr. Graham. He also told the defendant that Mr. Graham had died. The defendant told Detective Eads "I am not going down for this by myself." The defendant then proceeded to tell Detective Eads about his involvement in the assault on Mr. Graham. This took the defendant about 15 minutes. During this time, Detective Eads did not write down any notes. The defendant did not stutter during this time.

7. After the defendant admitted to Detective Eads that he had been involved in the assault and robbery of Mr. Graham, Detective Eads contacted a detective assigned to juvenile matters, Harold Layton. Detective Eads' asked Detective Layton to come to the police department to assist in making arrangements for placing the defendant in secure custody.

8. After calling Detective Layton, Detective Eads went back to the defendant and spoke with him about putting his statement in writing. The defendant told Detective Eads he could not write very well; however, he agreed to allow Detective Eads to write the statement for him. Detective Eads wrote a statement based on what the defendant had told him. This statement is State's Exhibit 2.

9. After writing the statement, Detective Eads went back over it with the defendant. He placed the statement in front of the defendant and read it to the defendant word for word as it was written. The defendant initialed the beginning and ending of each paragraph as well as two corrections on the second page. Detective Eads asked the defendant to sign the bottom of each page if he agreed that the statement was true. The defendant then signed the bottom of each page of the statement. The statement was signed at 6:25 p.m. on December 20, 1995.

10. After signing the statement, the defendant was allowed to call his grandmother. She came to the police department and was told by the officers what had

happened. She was given an opportunity to speak with the defendant. The defendant's mother also came to the police department and was told what happened. She also was given an opportunity to speak with the defendant.

11. The defendant is a black male with a date of birth of July 22, 1981. At the time of this incident, he lived primarily with his grandparents. He was and still is enrolled in the Lee County School System at Bragg Street Academy and received the grades set out on Defendant's Exhibits 1 and 2.

12. Prior to this hearing, the defendant was tested and examined by Dr. Stephen Hooper of the Clinical Center for the study of Development and Learning at the University of North Carolina at Chapel Hill. Dr. Hooper is an expert on child neuropsychology. According to Dr. Hooper, the defendant has an I.Q. of 66. The defendant tested as having writing comprehension at the 5.2 grade level and a listening comprehension of the 3.5 grade level. The defendant can read at about the fourth grade level and write at about the third grade level. The defendant also reported to Dr. Hooper that he had used marijuana on December 20, 1995, but did not tell Dr. Hooper how much he had used. Dr. Hooper testified that the Miranda Rights given to the defendant were at a 4.9 grade level. The Waiver of Rights paragraph was at an 8.4 grade level and the confession signed by the defendant was at a 5.6 grade level. However, Dr. Hooper stated these figures were variable depending on how the information was conveyed to the listener. Dr. Hooper also stated that some 33 words on the confession were not understood by him and not factored into the calculations on the grade level of the confession.

Detective Eads testified at trial and read Defendant's confession to the jury.

Defendant's signed confession was as follows:

We were on Goldsboro Avenue the night the cab driver got beat up. It was me, Elliott McCormick, who they call L.L.,

and Anthony Reid, who they call Pop, and Duriel Shaw, who they call Shaw Dog. Elliott McCormick called the cab company for a ride and had the cab meet us at the new apartments on Goldsboro Avenue that sit at the back fence to Oakwood Avenue apartments.

While the cab was coming, we got to planning how we were going to rob whoever the driver was. Duriel Shaw and Elliott McCormick were planning it out. Duriel was to snatch the money and Elliott was going to punch him. The older man who use to sell ice cream to us was the driver when the cab pulled up. All of us got in the back seat of the cab. Me, Duriel Shaw, Anthony, and Elliott McCormick. We were going to Kendale. Elliott McCormick and Duriel Shaw were going to stay together that night and Anthony Reid and I were going to stay together. Anthony is my double first cousin. Elliott is related to me also. Elliott McCormick is related to me through my father.

We directed the driver to the Kendale area on Humber Street by Hallman Foundry. We had him stop because we were going to rob him at that time. The meter read about $4 and none of us had any money. The driver, who we call Dad because he was so old, always drove real slow which took more time on the meter and increased the price. We had him stop in the roadway at the foundry and were going to rob him in the car. Me and Duriel Shaw tried to do so first in the car. We reached over the front where he sat and I tried to grab under his leg where he kept some money and Duriel Shaw was grabbing in his shirt.

The old cab driver got to grabbing our arms and moving around, so we stopped and we all jumped out of the cab and started returning. We all ran to the back of O'Connell's Supermarket and stopped. And Anthony Reid . . . said, '[expletive deleted] that, we're about ready to go back and rob him.'

We walked back to the cab. The cab driver was still in the car and sitting in the road on Humber Street and

talking on his microphone. As we approached him, he jumped out of the cab, started cussing, saying, 'I'm going to kill all you all . . . [expletive deleted],' and still walking towards us. We began beating him and found some wood sticks nearby and used them to hit him with also. The cab driver fell to the ground on the pavement on the roadway. Duriel Shaw, Anthony Reid, Elliott McCormick, and I began going through his pockets. I found $5 in one dollar bills in his left front shirt pocket and I took it. I don't know if the rest of them got any money or not, but they were going through his pockets. We decided also, when we walked back to the cab driver as he sat in the road, to take his car, but we didn't. We just left it in the road. Elliott McCormick, Duriel Shaw, and Anthony Reid, and I all ran away together to Windham's Electronics and over to Crown Cable, and then ran behind Kerr Drugs and split up afterwards. Duriel and Elliott went to Elliott McCormick's house, and me and Anthony went to my house. We did not go back over toward Dalrymple and Humber Street.

I don't recollect anyone taking anything from the car, at least I know I didn't. The next day we all got together on Shawnee Circle at the back fence and talked about it. We talked about how we could have killed him and how we could have taken the cab. We all promised not to talk about it. I tried to call Central Carolina Hospital after we beat him, but I didn't know his name. I think he use to go to New Zion Baptist Church with us. I also think he was a friend of one of my mom's friends. My grandmother had even told me she knew his wife. I never said anything to anyone about it until tonight.

I really would like to apologize for what I've done and especially to an old man like him. I was never ever like this until I got to hanging around with these other boys and drinking and smoking marijuana. I usually drank beer and not liquor. I had been drinking beer that night and had drank a 22 ounce IceHouse Beer. The rest of us – the rest had been drinking gin, Canadian Mist, white liquor and beer. We were getting the beer and liquor from an Ann

Budes who stays nearby where we were staying – were standing around at the new apartments on Goldsboro Avenue. We all had also been smoking marijuana in blunts by inserting marijuana in the cigar so the cigar would cover the smell.

I'm truly sorry for what I've done and I tried to turn a bad thing around that I have done by being truthful and cooperative concerning this incident. I swear that all I've told Detective J.M. Eads of the Sanford Police Department is the truth, and it was Duriel Shaw, Elliott McCormick, and Anthony Reid and myself who beat the cab driver and that we also used sticks to do this because we intended to rob him and did rob him after we beat him. I have further allowed Detective Eads of the Sanford Police Department to write this statement for me in order that I may accurately reflect what happened that night and, again, how truly sorry I am for what I've done.

On July 24, 1997, a Lee County jury found Defendant guilty of first-degree murder and common law robbery. Defendant appealed, alleging the trial court erred when it denied his motion to suppress his confession.

In an unpublished opinion filed on October 19, 1999, this Court upheld Defendant's conviction and determined that the trial court did not err when it denied Defendant's motion to suppress. In so holding, we considered information in the record that Defendant was a slow learner, had an overall IQ of 66, read on a third-grade level, and other circumstances surrounding his confession. We noted that

[w]hile a defendant's subnormal mental capacity is a factor to be considered in determining whether the defendant's waiver of rights is intelligent, knowing and voluntary, such lack of intelligence, standing alone, is insufficient to render a statement involuntary if the circumstances otherwise indicate that the statement is voluntarily and intelligently

made. *State* v. *Fincher*, 309 N.C. 1, 305 S.E.2d 685 (1983). Likewise, a defendant's young age is a factor to be considered, but his youth will not preclude a finding of voluntariness in the absence of mistreatment or coercion by the police. *Id.*

Despite the evidence cited by defendant of his below average intelligence, comprehension, and verbal abilities, there is substantial evidence in the record to support the trial court's determination. Detective Eads testified that he asked defendant whether he understood each right and whether he had any questions. Defendant responded that he understood and that he did not have any questions. Detective Eads further testified that he did not have any difficulty communicating with defendant, and that he did not have to repeat himself to make himself understood by defendant, who was very attentive. He also testified that defendant did not stutter during the interview.

None of the witnesses presented by defendant were present in the interrogation room to observe defendant and to determine whether he actually understood his rights at the time. There is nothing in the record to indicate that Detective Eads or any police officer coerced defendant into giving a statement. To the contrary, Detective Eads' testimony indicates that defendant voluntarily gave the statement to not "go down for this alone."

Because there is ample evidence to support the court's findings of fact, those findings are binding. *State* v. *Rook*, 304 N.C. 201, 283 S.E.2d 732 (1981), *cert. denied*, 455 U.S. 1038, 72 L. Ed. 2d 155 (1982). We also find that the court's findings of fact support its conclusions of law and its order denying the motion to suppress.

*State v. Reid*, No. COA98-1392, at *4-6 (N.C. Ct. App. Oct. 19, 1999) (unpublished).

Defendant subsequently filed post-conviction motions, including this motion for appropriate relief pursuant to N.C. Gen. Stat. § 15A-1415(c).   Specific to this

motion, Defendant alleged that William McCormick ("McCormick") had provided newly discovered evidence in an affidavit dated June 14, 2011. McCormick's affidavit contained the following assertions:

> 3.      In 1995, I was sixteen years old, and I lived with my mother and brother Elliott McCormick at 417 Judd St. in Sanford, NC.
>
> 4.      At the time, my mother worked the night shift and was also a minister.
>
> 5.      Utaris Reid often visited my home and spent time with my brother and me.
>
> 6.      Utaris Reid was younger than me, and he lived about four houses away on Shawnee Circle.
>
> 7.      Utaris came to our house often because his mother and her boyfriend were drug-addicts, and he often had to provide for himself.
>
> 8.      Utaris would visit with his grandmother who lived out in the country. She cared for Utaris and bought him clothes and necessities.
>
> 9.      Utaris was in special education classes in school, and he was slow.
>
> 10.     My brother Elliott and I would often use taxi cabs to go to and from our home at night.
>
> 11.     I knew cab driver John Graham by the nickname "Pop."
>
> 12.     On the night that Mr. Graham was assaulted, I remember staying at home.

13.    My mother, a minister, anointed my head and my brother Elliott's head with oil, and she was moving about the house speaking in tongues. She said that she had a feeling that something bad was going to happen that night, *so she stayed home from work*. She made my brother and I stay home even though we wanted to go out.

14.    At the time, my brother Elliott and I were involved in selling crack cocaine on the street near the Goldsboro apartments.

15.    Since we were not allowed to leave the house that night, our friends came to the house to get drugs.

16.    Robert Shaw, Norman Cox, and T. Bristow *came to the house, and they were sweating and out of breath. I learned from Shaw that they had left a cab without paying the fare and ran to the house.*

17.    *My mother made my friends leave the house that night, and they did.*

18.    The next day, I had a conversation with Robert Shaw. *He told me that when he, Norman Cox, and T. Bristow left my house, they got a cab to take them across town.* John Graham, or "Pop," was the cab driver.

19.    Shaw told me that he told Pop that they did not have enough money to pay the fare. Pop stopped the cab near the foundry and told the boys to get out. Shaw was in the front passenger seat, and Cox and Bristow were in the back seat. Cox and Bristow got out of the cab. As Shaw was getting out of the cab, Shaw grabbed Pop's money bag. Pop grabbed Shaw's gold necklace, broke it, and pulled it off Shaw. Shaw began to punch and hit Pop, trying to get his necklace back. Cox and Bristow joined Shaw beating, kicking, and stomping Pop. Shaw got his necklace away from Pop and the three boys ran. There was only $5 in the money bag.

20.     After Pop died, the police came to my house because they were looking for teenage boys who used cabs with Judd Street destinations.

21.     The police picked up my brother Elliott and Utaris Reid and took them to the police station.

22.     My brother Elliott told me that he was placed in an individual room. He said that the police were yelling and throwing chairs around in the room trying to get him to confess to murder. They asked him to sign a paper, but Elliot[t] refused to sign.

23.     Elliot[t] has since passed away.

24.     I was not interviewed by the police or any attorneys involved in Utaris Reid's case.

25.     After Utaris Reid was convicted and sentenced, I felt bad because I knew that he did not commit the murder.

26.     I went to the Sanford Police Department and spoke to Detective Freeman Worthy. I told Detective Worthy that Utaris Reid did not commit the crime he was convicted of. I told him that Shaw, Cox, and Bristow committed the crime.

27.     In 2005, I saw Detective Worthy at the Piggly Wiggly supermarket. I told him again that they convicted the wrong man, and I told him that Shaw, Cox, and Bristow committed the crime.

(Emphasis added).

At the hearing on the motion for appropriate relief, McCormick testified over the State's objection that Defendant was "slow." McCormick also testified that he and Defendant were friends when they were younger and "smoked weed together."

McCormick testified, contrary to his affidavit, that on the night John Graham was murdered, "[m]y mom worked the graveyard, and this particular night, my mom was working graveyard." According to McCormick, the graveyard shift was from 11:00 p.m. to 7:00 a.m. McCormick and his brother, Elliott, had planned to go across town that night to sell drugs, but their mother made them stay home. According to McCormick, he and Elliott invited Robert Shaw ("Shaw"), Antonio Bristow ("Bristow"), and Norman Cox ("Cox") over to their mother's house. McCormick then testified to the subsequent series of events:

> When they finally got there and the doorbell rang, my mom was like, who is at the door? She said, I told y'all, y'all not going nowhere tonight. We went to the door. [ ] Shaw, [ ] Bristow, [ ] Cox, and you know, they was – you know, we looked outside. The cab wasn't there, but they was there, and then they was sweating and, you know, out of breath, running from wherever they came from[.]
>
> . . .
>
> [Shaw] told us that they had just jumped out of the cab. They jumped out of the cab because they didn't have no money, so they jumped out of the cab.

According to McCormick, Shaw, Bristow, and Cox were at his mother's house for no more than 10 minutes before his mother ran them off.

When asked if Shaw told him anything else the night Graham was murdered, McCormick replied

> That night? *Not that night. It was already wee hours of the morning. It was already late night anyway,* so, but they, you know, because my mama ran us off, the next day they

told me what – they told my brother and I what they had done. They assaulted Mr. Johnny Graham.

(Emphasis added).

McCormick testified that Shaw told him that he, Norman, Bristow and Cox killed Graham before they arrived at the McCormick house. Specifically, according to McCormick, Shaw told him that:

> Well, he told how he called a cab in the middle – well, when he called the cab, he told them where he was coming, you know, to [Judd] Street, you know, which is our address, and said when they got by around the Hallman Foundry, they just told him, they said, Pop, you know, we only got five dollars. He was like, that's all y'all got? And Pop, you had to know him. Pop, he is an old guy. Cab driver. He talked junk, you know. We talked junk to him. You know. And he said – he told, said, Pop, we only got five dollars. He said, look, y'all get y'all book, and he used profane language, told them to get out of his cab, you know, if that's all you got, you know. And [Shaw] was sitting in the front seat. [Shaw] told me once he went to jump out the cab, he grabbed the money bag. And Mr. Pop had a money bag. He grabbed the money bag. Pop still had his seatbelt on. He reached and grabbed [ ] Shaw by the back of the shirt, and when he grabbed the back of his shirt, he grabbed his necklace. And when [ ] Shaw jumped out of the car, he kept his necklace in his hand. So [ ] Shaw wanted to get his necklace back, so [ ] Shaw told me Pop was trying to call in dispatch with the CB thing they had in the car at the time. That's when they commenced to beating on him, trying to get his necklace back. And they beat the man, and they told me they beat him and they stomped him, but at the time, they didn't know they did, you know.
>
> . . .
>
> Once they beat him and stomped him, and [ ] Shaw's necklace was broke, and Mr. Johnny still had it in his own

- 14 -

> hand. They had to end up prying it out of his hand to get the necklace out. You know. He held on tight to it. And they ran to our house as soon as they did. That's why, when they came to the door, they was sweating and out of breath.

Elliott was arrested along with Defendant for Graham's murder and spent 19 months in custody awaiting trial before the charges against him were dismissed. According to McCormick, he did not inform law enforcement about Shaw's purported confession because he lived by a street code, and Elliott told him not to say anything because the police had no evidence.

McCormick was also permitted to testify, over the State's objection, about alleged police interrogation "tactics," and that Defendant did not read his confession before he signed it. There was no evidence provided that McCormick was in the interrogation room when Defendant confessed. However, McCormick did testify that he was in court during Defendant's trial. After Defendant was convicted, but sometime "before 2005," McCormick purportedly told a detective that Defendant did not kill Graham.

On December 7, 2018, the trial court granted Defendant's motion for appropriate relief and vacated Defendant's conviction on the grounds of newly discovered evidence pursuant to N.C. Gen. Stat. § 15A-1415(c), and a violation of Defendant's due process rights. The trial court made the following relevant findings of fact:

> 1.    . . . The principal State's evidence against Defendant was a statement taken from Defendant by the lead

detective. Defendant was 14 years old and had a combined IQ of 66 when he signed the statement. No eyewitnesses testified against Defendant at trial. . . .

2.      At trial, Defendant challenged the credibility of the written statement and offered an alibi defense. Trial counsel hired an investigator for the specific purpose of interviewing the McCormick brothers, William and Elliott, potential witnesses in the case, but was unable to interview them by the time of Defendant's trial. In 2011, Defendant's MAR investigator located William McCormick, and he was interviewed by the defense for the first time. Mr. McCormick testified at the MAR hearing that another teenager confessed to the assault and robbery the day after it occurred. The teenager was with two others, who were not Defendant. Trial counsel would have offered this evidence if it was available at the time of Defendant's trial because it would exculpate Defendant and bolster his alibi defense.

. . .

7.      Defendant filed a motion to suppress his written statement, and a hearing was held during the August 29, 1996 session of Lee County Criminal Superior Court before the Honorable Wiley F. Bowen. Judge Bowen denied the motion to suppress. On appeal, the denial of the motion to suppress was upheld. For purposes of the MAR, the Defendant's statement has been treated as properly admitted into evidence, with its weight and credibility for the jury.

8.      The case was heard for trial at the October 1, 1996 session of Lee County Criminal Superior Court before Judge Bowen. A mistrial was declared because of a hung jury.

9.      The case came on for trial again at the July 21, 1997 session of Lee County Criminal Superior Court before the Honorable Henry E. Frye.

10. On July 24, 1997, the jury found the defendant guilty of first degree murder based on the felony murder rule during the commission of a common law robbery.

11. Defendant was sentenced to a mandatory punishment of life imprisonment without parole. The court arrested judgment on the conviction for common law robbery.

. . .

14. The victim in the case, John Graham, worked as a cab driver on the date of offense, October 21, 1995. During his shift, he radioed for help. Other cab drivers and paramedics responded to his location within minutes, around 7:19 p.m.

15. Officers responded to the scene of the assault. The victim's cab was not secured, the police did not collect any physical evidence, and there were no eyewitnesses. There were no fingerprints, blood evidence, or any weapon.

16. The victim was unable to respond to paramedics except for opening his eyes in response to his name. He suffered an apparent head injury from an assault or fall. His visible injuries were mostly minor puncture wounds, lacerations and abrasions around his left eye. Medical examination revealed a 3 centimeter by 3 centimeter hemorrhage to the right side of the victim's brain which, according to medical testimony at trial, could have been caused by Mr. Graham falling and hitting his head.

17. The victim was interviewed in the emergency room by police. The lead detective, James Eads of the Sanford Police Department, testified that the victim told police that two black males age 16 to 19 years old were responsible for the assault. During cross-examination at the first trial, Detective Eads testified that the victim gave the information to police and he recorded the information in

his report. He also testified at the first trial that the victim told police that he had picked up the two black males before and that they had not taken anything from him on the night of the assault.

18.    At the second trial, Eads changed his testimony and testified that the victim was unable to communicate verbally with him at all in the emergency room. Eads was cross-examined by Attorney Webb with his testimony from the first trial.

. . .

21.    On December 20, 1995, James Eads, the same detective who interviewed the victim, went to Defendant's grandfather's house and picked up Defendant at about 4:15 p.m. to take him to the police station to interview him. The detective told Defendant's grandfather that he would bring him back in 15-20 minutes. Defendant's grandfather was elderly and the detective could not tell whether the grandfather was drinking.

22.    Defendant was 14 years old and did not have a parent or guardian present when he was interviewed.

23.    The Sanford Police Department had two juvenile detectives on their staff at the time. They would have left the police station at 4:00 p.m. when their shifts ended. Detective Eads did not use a juvenile detective when he interviewed Defendant. Detective Eads shift started at 8:00 a.m., but he waited until after the juvenile detectives left to pick up Defendant and interview him.

24.    Juvenile detectives were available for the interview as they were on call twenty-four hours.

25.    Detective Eads conducted the interview with Defendant in an interview room that was approximately 8 feet by 10 feet with a table and chairs and no windows.

26. Detective Eads did not record the interview with Defendant. He said that he was not certified in the operation of any tape recording equipment so he could not use it.

27. Detective Eads testified that Defendant talked or "rambled" uninterrupted for thirty minutes without having to be prompted with questions to continue talking.

28. Detective Eads wrote the statement that Defendant signed. The detective acknowledged that some of his own writing was difficult to read and he read the statement back to Defendant.

29. Detective Eads testified that he would have treated Defendant differently if he knew he had trouble comprehending, but he treated him as an ordinary 14-year-old.

30. Attorney Webb hired Dr. Steven Hooper, a child and adolescent neuropsychologist at the Child Development Institute at the University of North Carolina at Chapel Hill, as an expert witness. Dr. Hooper determined that Defendant had a full scale IQ of 66, which was in the first or second percentile for 14-year-olds. Dr. Hooper testified that the test was reliable and Defendant was trying hard.

31. Defendant's overall functioning was at a fourth-grade level. His writing was at a mid-third grade level and Defendant had disproportionately low deficits in visual attention and expressive language.

32. Dr. Hooper did a readability analysis to determine the grade level of the *Miranda* warnings given to Defendant and the waiver of rights form. The *Miranda* warnings were at a fifth grade level and the waiver of rights form was at a mid-eighth grade level.

33. Dr. Hooper conservatively estimated the written statement was at a mid-fifth grade level. There were thirty-

three words he could not read so he did not include those. Had they been included, the grade level would likely have been higher.

34.     Dr. Hooper opined that it was highly unlikely Defendant understood the *Miranda* rights or the waiver of rights form. He also opined that he did not think Defendant understood the written statement. Defendant's listening comprehension was his lowest area, at a mid-third grade level and his overall reading, decoding, and sight words were a 5.2 grade level.

35.     According to the written statement, signed by Defendant, there were four young males involved in the victim's assault: Duriel Shaw, Anthony Reid, Elliott McCormick, and Defendant. This was a significant difference from the information alleged to have been provided by the victim in the emergency room immediately following the assault, in which he was said to have informed police he was attacked by two black males, 16-19 years old. According to the alleged statement of Defendant, the youths were riding in a cab driven by the victim and tried to reach into his shirt pocket and under his leg for money. When the victim resisted, the youths began to run away, but then returned. The victim got out of his car and walked towards the youths, saying that he would "kill you". Some of the youths then hit the victim, using wood sticks they picked up nearby. The victim fell on the pavement, where money was taken from his pocket.

. . .

37.     John Love, a co-worker and good friend of the victim, testified at the second trial, but did not testify at the first trial. Love heard the victim call for help over the radio and went to the scene. He testified that he asked the victim who did this and the victim replied with three words or names, L.L., McCormick, and Reid. Love did not remember the order in which the victim said the names. However, Love did not provide this information to [ ] Detective Eads when

he met with him shortly after the incident. Love said he did not "put together what he was talking about until later." Love did not know whether the victim was just mumbling. Love did not claim the victim specified who "Reid" was, whether the Defendant or Anthony Reid.

. . .

48.     At the evidentiary hearings, Defendant produced evidence through the testimony of William McCormick ("Mr. McCormick") and Attorney Fred Webb, additional documentary exhibits, and the transcripts of both trials and the hearing on Defendant's motion to suppress. The Court listened to the testimony and observed the demeanor of these witnesses, and finds that each gave credible and truthful testimony on every issue that was material to the findings of fact and conclusions of law which are necessary to reach a ruling on the issues raised in the instant matter. William McCormick was emotional during his testimony. His demeanor gave convincing force to his testimony.

49.     Mr. McCormick was located by Defendant's investigator in 2011. He swore to an affidavit that was submitted as an exhibit to the MAR.

. . .

55.     On the night that the victim was assaulted, Mr. McCormick and his brother, Elliott, were not allowed to leave their house on Judd Street. William McCormick expected three other juveniles, *Robert Shaw, Antonio "T" Bristow, and Norman Cox to come to the McCormick house that night by cab. Robert Shaw, T Bristow and Norman Cox showed up on the doorstep but there was no cab outside. Defendant was not with them and was never mentioned at any time. Shaw, Bristow and Cox were sweating and out of breath from running. Robert Shaw said they jumped out of the cab because they did not have any money. The evidence indicated Shaw had jumped out of the cab only a short time*

*before this statement. Mr. McCormick's mother made Shaw, Bristow, and Cox leave.*

56.     The next day, Robert Shaw told Mr. McCormick that he, Antonio Bristow, and Norman Cox assaulted the victim John Graham. Shaw said that he took the victim's money bag and when he tried to jump out of the cab the victim grabbed Shaw's necklace, which broke. Shaw explained that they beat the victim to get the necklace back. Shaw did not say that Defendant was involved. Robert Shaw, T Bristow, and Norman Cox were not the juveniles named in the written statement introduced at Defendant's trial. *Shaw told William McCormick that Shaw, Bristow and Cox ran to McCormick's house "as soon as they did" the robbery.* The victim was in fact assaulted near the Hallman Foundry, located no more than a mile from William McCormick's house.

. . .

58.     When he was 16 years old, Mr. McCormick sold drugs and lived a different life than when he testified before this Court. When he was a teenager, he did not get along with police and did not talk to the police because he followed a "street code." Before Defendant's trial, Mr. McCormick did not tell police the information that he testified to at the MAR hearing. He explained that the street code meant not to talk to police or help them do their job. Mr. McCormick explained that he no longer followed a street code and he decided to turn his life around after his brother was murdered in 2000.

59.     This Court finds Mr. McCormick's testimony to be credible. The court finds that McCormick in fact has no motive to testify for Defendant other than to disclose the true facts known to him.

60.     Attorney Webb represented Defendant at both trials and the direct appeal of his case. Attorney Webb had a degree and training in special education and was

experienced working with adolescents. Defendant was 14 years old when Attorney Webb was appointed to his case and 16 years old when he was convicted. Attorney Webb recognized that Defendant was slow and had difficulty communicating.

61.    Attorney Webb filed a motion to suppress the written statement and retained Dr. Steven Hooper. Following a hearing, the motion to suppress was denied.

62.    Attorney Webb challenged the credibility of the police investigation and the written statement and raised an alibi defense at trial.

63.    Before trial, Attorney Webb spoke to contacts "in the street" who had provided information that led him to believe Defendant was not involved in the crime. The names of the McCormick brothers, William and Elliott, came up as witnesses who had information that could be helpful to the defense. Attorney Webb moved for and secured funds to retain Investigator Mel Palmer for the specific purpose of locating and interviewing William McCormick. In the motions and orders for investigator funding, Attorney Webb specified that he was trying to locate William McCormick.

64.    Investigator Palmer attempted to interview William McCormick, but was unable to locate him. Investigator Palmer made attempts to serve William McCormick with a subpoena but was unable to do so. McCormick's mother interfered with the investigator's efforts to locate William and would not allow him to be interviewed.

65.    Attorney Webb was contacted by Defendant's counsel during the post-conviction investigation of Defendant's case. Attorney Webb reviewed the affidavit of William McCormick. Had Attorney Webb been able to locate and interview William McCormick at the time of trial, Attorney Webb would have called him to testify to the information contained in the affidavit.

66.     Attorney Webb would have presented William McCormick's testimony because he found that it would have exculpated Defendant and bolstered Defendant's alibi defense.

67.     William McCormick's testimony was evidence that went to Defendant's guilt or innocence, since it provided the identity of the actual perpetrators and tended to exonerate Defendant.

(Emphasis added).

The trial court then made the following relevant conclusions of law:

2.     Defendant properly raised his newly discovered evidence claim pursuant to N.C. Gen. Stat. § 15A-1415(c).

3.     Defendant Reid met his burden of proving the necessary facts by a preponderance of the evidence. N.C. Gen. Stat. § 15A-1420(c)(5).

4.     William McCormick's testimony is newly discovered evidence as defined by law. The details of his testimony were unknown to Defendant at the time of trial, and William McCormick was unavailable to Defendant at that time. Defendant could not have discovered or made available the new evidence from McCormick with due diligence. The new evidence has a direct and material bearing upon the Defendant's guilt or innocence. Defendant's motion was filed within a reasonable time of the discovery of the new evidence.

5.     *The newly discovered evidence is probably true.*

6.     *The newly discovered evidence is competent, material and relevant. It identifies the actual perpetrators of the offense and exculpates the Defendant.*

7.     Evidence of William McCormick's personal observations of Robert Shaw, Antonio "T" Bristow and

Norman Cox on the night of the offense, including that these three individuals were together, were sweating and out of breath, that neither a cab nor the Defendant were present, are admissible at trial.

8. Testimony from William McCormick regarding statements made by Robert Shaw that he, Bristow and Cox jumped out of a cab and ran because they did not have any money are *admissible as an excited utterance under North Carolina Rule of Evidence 803(2). Shaw was under the stress of a startling or unusual event at the time this statement was made, sufficient to suspend reflective thought, and causing a spontaneous reaction not resulting from fabrication.*

9. After careful scrutiny, the court concludes that the testimony of William McCormick about Robert Shaw's statement regarding the details of Shaw, Bristow and Cox assaulting the victim is admissible evidence under Rule 803(24). *First, the State is on notice that Defendant would offer such evidence at trial. Second, this hearsay evidence is not specifically covered by any other exception in Rule 803. Third, the evidence possesses circumstantial guarantees of trustworthiness equivalent to other hearsay exceptions because it constitutes an admission of criminal conduct by Shaw, is consistent with events actually observed by William McCormick the day before, when Shaw and the other youths arrived at McCormick's house out of breath having jumped and run from a cab, and is consistent with known circumstances of the case, including that the victim was assaulted by more than one young male person. Fourth, the evidence is material to the case. Fifth, the evidence is more probative on the issue of whether Shaw, Bristow and Cox, rather than Defendant, were the actual perpetrators of these crimes than any other evidence procurable by reasonable efforts. Defendant cannot reasonably be expected to procure the in-court confession of Shaw that Shaw himself is guilty of robbery and first degree murder. Sixth, admission of the evidence of Shaw's statements will best*

*serve the purposes of the Rules of Evidence and the interests of justice. State v. Smith, 315 N.C. 76 (1985).*

10.    In addition to those circumstantial guarantees of truthfulness set forth above, Shaw's statements regarding the murder of the victim have the following circumstantial guarantees of truthfulness: (1) Shaw had personal knowledge of the events described; (2) Shaw had a strong motivation to confide the truth to his friend William McCormick and no reason to claim false responsibility for such serious acts which could expose him to criminal liability; and (3) there is no evidence that Shaw ever recanted his statement.

11.    The evidence before the court does not support conclusions as to the availability or unavailability of the declarant Shaw for trial. Given the passage of more than twenty years in silence, Shaw's cooperation and availability for trial may well be doubted, but his unavailability cannot be assumed. If Shaw is unavailable, his statements to McCormick would be admissible in any case as statements against penal interest under Rule 804(b). However, taking Shaw's unavailability <u>not</u> to have been established, as the court must do given the Record before it, his statements to McCormick are still admissible under Rule 803(24) for the reasons set forth above.

12.    Given the emotional impact and persuasive effect of William McCormick's testimony and the circumstantial indications of the truthfulness of Shaw's statements, it would be a manifest injustice to deny Defendant the opportunity to introduce McCormick's evidence regarding the statements of Robert Shaw that it was Shaw, Antonio Bristow and Norman Cox who killed the victim in this case. Admission of Shaw's statements under Rule 803(24) will best serve the interests of justice. It is consistent with the general purposes of the Rules of Evidence.

13. Defendant used due diligence and proper means to procure the testimony of William McCormick at Defendant's original trial.

14. The newly discovered evidence is not merely cumulative.

15. The newly discovered evidence does not tend only to contradict, impeach or discredit a former witness.

16. The newly discovered evidence is of such a nature as to show that on another trial a different result will probably be reached and that the right will prevail. This was an extremely close case, tried once to a hung jury, *finally resulting in a conviction based largely on the purported confession* of the fourteen year old, mentally disabled Defendant. No physical evidence connected Defendant to the case, and alibi evidence was offered. The addition of credible testimony from William McCormick will probably result in a different outcome than that reached in the original trial.

17. The testimony of William McCormick points directly to the guilt of specific persons and is inconsistent with Defendant's guilt.

18. In addition, as an independent grounds for decision, denying Defendant the opportunity to present all of the newly discovered evidence to a trier of fact would, under the circumstances of this case, violate Defendant's federal and state constitutional rights to due process of law.

(Emphasis added).

Based upon these findings of fact and conclusions of law, the trial court vacated

Defendant's conviction and ordered a new trial.

The State appeals, arguing that the trial court (1) erred when it determined

that Defendant's confession was a "purported confession;" (2) abused its discretion

when it granted Defendant a new trial; and (3) erred when it determined that Defendant's due process rights would be violated if he were not allowed to present the new evidence at a new trial. At oral arguments before this Court, Defendant's attorney stated that Defendant was innocent of the crimes charged, but acknowledged that Defendant had not filed an affidavit of innocence in this or any other court.

We reverse the decision of the trial court.

## Standard of Review

"When considering rulings on motions for appropriate relief, we review the trial court's order to determine whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court." *State v. Frogge*, 359 N.C. 228, 240, 607 S.E.2d 627, 634 (2005) (citation and quotation marks omitted).

"Findings of fact made by the trial court pursuant to hearings on motions for appropriate relief are binding on appeal if they are supported by competent evidence." *State v. Morganherring*, 350 N.C. 701, 714, 517 S.E.2d 622, 630 (1999) (citation and quotation marks omitted). A "trial court's conclusions [of law] are fully reviewable on appeal." *State v. Lutz*, 177 N.C. App. 140, 142, 628 S.E.2d 34, 35 (2006) (citation and quotation marks omitted).

A trial court's findings of fact "may be disturbed only upon a showing of manifest abuse of discretion." *Id.* at 142, 628 S.E.2d at 35 (citation and quotation marks omitted). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Elliott*, 360 N.C. 400, 419, 628 S.E.2d 735, 748 (2006) (citation and quotations omitted).

Analysis

On appeal, the State argues that the trial court (1) erred when it determined that Defendant's confession was a "purported confession;" (2) abused its discretion when it granted Defendant a new trial; and (3) erred when it determined that Defendant's due process rights would be violated if he were not allowed to present the new evidence at a new trial. We agree.

A defendant may file a motion for appropriate relief at any time following a verdict on

> the ground that evidence is available which was unknown or unavailable to the defendant at the time of trial, which could not with due diligence have been discovered or made available at that time, including recanted testimony, and which has a direct and material bearing upon the defendant's eligibility for the death penalty or the defendant's guilt or innocence.

N.C. Gen. Stat. § 15A-1415(c) (2019). The defendant "has the burden of proving by a preponderance of the evidence every fact essential to support the motion." N.C. Gen. Stat. § 15A-1420(c)(5) (2019).

I. Determination that Defendant's Confession was a "Purported Confession"

The State first argues the trial court erred when it determined that Defendant's confession to the murder of Graham was a "purported confession." Specifically, the State argues that the trial court abused its discretion because the trial court was bound by this Court's prior decision regarding the validity of Defendant's confession. However, because we reverse the trial court for the reasons stated below, we decline to address this argument.

II. Newly Discovered Evidence

The State next contends that the trial court abused its discretion when it granted Defendant a new trial. Specifically, the States argues that Defendant failed to prove the purported newly discovered evidence by a preponderance of the evidence. We agree.

> In order for a new trial to be granted on the ground of newly discovered evidence, it must appear by affidavit that (1) the witness or witnesses will give newly discovered evidence; (2) the newly discovered evidence is probably true; (3) the evidence is material, competent and relevant; (4) due diligence was used and proper means were employed to procure the testimony at trial; (5) the newly discovered evidence is not merely cumulative or corroborative; (6) the new evidence does not merely tend to contradict, impeach or discredit the testimony of a former witness; and (7) the evidence is of such a nature that a different result will probably be reached at a new trial.

*State v. Beaver*, 291 N.C. 137, 143, 229 S.E.2d 179, 183 (1976).  It is *the defendant's burden* to "prov[e] by a preponderance of the evidence every fact essential to support the motion."  N.C. Gen. Stat. § 15A-1420(c)(5).

> [A] new trial for newly discovered evidence should be granted with the utmost caution and only in a clear case, lest the courts should thereby encourage negligence or minister to the litigious passions of men. The defendant has the laboring oar to rebut the presumption that the verdict is correct and that he has not exercised due diligence in preparing for trial. Under the rule as codified, the defendant has the burden of proving that the new evidence could not with due diligence have been discovered or made available at the time of trial.

*State v. Rhodes,* 366 N.C. 532, 536-37, 743 S.E.2d 37, 40 (2013) (*purgandum*).  We address the pertinent factors below.

A.  Probably True

The trial court determined in conclusion of law 5 that the purported "newly discovered evidence was probably true" and that McCormick was a credible witness. While "[t]he trial court is in the best position to judge the credibility of a witness," *State v. Garner*, 136 N.C. App. 1, 14, 523 S.E.2d 689, 698 (1999), McCormick's testimony was internally inconsistent and contrary to his sworn affidavit.  Although the trial court found McCormick's testimony credible, it is so contrary to the information contained in his affidavit that we cannot conclude that the information is probably true.

McCormick's sworn affidavit, which was admitted into evidence at the MAR hearing, contradicted his testimony at the hearing. McCormick's affidavit states that Shaw, Cox, and Bristow came to McCormick's house sweating and out of breath because they fled from a cab without paying the fare. Just two paragraphs later, McCormick's affidavit states that Shaw told McCormick they robbed and murdered Graham after they left McCormick's home that night.

At the hearing, McCormick testified that when Shaw, Cox, and Bristow arrived at his home, they were sweating and out of breath from "running from wherever they came from." Shaw, Cox, and Bristow allegedly ran from the murder scene "to [the McCormick's] house as soon as they did [the murder]." In addition, McCormick stated that Shaw told him they had jumped from the cab without paying the fare. But no explanation was provided concerning why Shaw, Cox, and Bristow did not pay Graham when Elliott had agreed to pay the fare.

Moreover, McCormick testified that his mother "was working graveyard [shift]" from 11:00 p.m. until 7:00 a.m., and that he remembered telling her to go to work that night because they were waiting for her to leave to then sell drugs. However, his affidavit indicates that his mother "stayed home from work" that evening.

When asked how long Shaw, Cox, and Bristow stayed at his house that night, McCormick responded, "[m]aybe five, ten minutes. My momma ran them off."

McCormick then testified that Shaw did not tell him anything about Graham's murder that night because "[i]t was already the wee hours of the morning." However, finding of fact number 13 states that paramedics responded to the scene of Graham's murder at 7:19 p.m. According to McCormick's testimony, Shaw, Cox, and Bristow fled from Graham's cab to his home. The three were then at McCormick's home for at most ten minutes before his mother ran them off in "the wee hours of the morning." However, if McCormick's mother was working the graveyard shift as he testified, she could not have been home in "the wee hours of the morning" to run Shaw, Cox, and Bristow off. Accordingly, not only is McCormick's testimony probably not true, but it is entirely impossible to reconcile the discrepancies in the information provided by McCormick.

In light of McCormick's conflicting affidavit and inconsistent testimony, Defendant failed to demonstrate by a preponderance of the evidence that the information provided by McCormick is probably true.

B. Evidence in Existence at the Time of Trial and Due Diligence

"Newly discovered evidence is evidence which was in existence but not known to a party at the time of trial." *State v. Nickerson*, 320 N.C. 603, 609, 359 S.E.2d 760, 763 (1987). "Pursuant to N.C.G.S. § 15A–1415[(c)], newly discovered evidence must be unknown or unavailable to the defendant at the time of trial in order to justify relief." *State v. Wiggins*, 334 N.C. 18, 38, 431 S.E.2d 755, 767 (1993) (citation and

quotation marks omitted). Thus, where "the purported newly discovered evidence was known or available to the defendant at the time of trial, the evidence does not meet the requirements of N.C.G.S. § 15A-1415(c)." *Rhodes*, 366 N.C. at 537, 743 S.E.2d at 40.

The trial court found that prior to the original trial, "Attorney Webb spoke to contacts 'in the street' who had provided information that led him to believe Defendant was not involved in the crime." Knowing this, Webb hired Investigator Palmer to speak with McCormick, however, McCormick never spoke with Investigator Palmer. The trial court stated in finding of fact 64 that "Investigator Palmer attempted to interview William McCormick but was unable to locate him." In finding of fact 65, the trial court found that "[h]ad Attorney Webb been able to locate and interview William McCormick at the time of trial, Webb would have called him to testify to the information contained in the affidavit."[1]

Webb testified that he had made "contact through some of the people that [he] knew in the street who brought up the names of other guys that they thought had [assaulted Graham] . . . the McCormicks names popped up in those conversations."

---

[1] The trial court based its conclusion that the information from McCormick was newly discovered evidence, in part, on a finding that "the details of [McCormick's] testimony were not known at the time of trial." The trial court's wording is troubling because this is generally true of all testimony – practitioners and judges do not know what a witness's testimony will be until the witness actually testifies. Under the trial court's interpretation of newly discovered evidence, virtually any information not originally introduced at trial could qualify as newly discovered evidence, even though it could have been discovered through other methods or witnesses.

Despite having this information, Webb failed to utilize available procedures to secure McCormick's statement or testimony. Specifically, Webb did not (1) issue a subpoena, (2) request a material witness order, (3) request a recess, (4) make a motion to continue, (5) alert the trial court to the existence of this information, or (6) otherwise preserve this information in the record at trial. *See State v. Smith*, 130 N.C. App. 71, 77, 502 S.E.2d 390, 394 (1998) (dismissing defendant's argument because the defendant did not avail himself of the methods to procure a witness at trial).

Webb could have secured McCormick's attendance to testify at trial by subpoena. *See* N.C. Gen. Stat. § 15A-801. In addition, Webb failed to file a motion for a material witness order. A material witness order is

> an order assuring the attendance of a material witness at a criminal proceeding. This material witness order may be issued when there are reasonable grounds to believe that the person whom the State or a defendant desires to call as a witness in a pending criminal proceeding possesses information material to the determination of the proceeding and may not be amenable or responsive to a subpoena at a time when his attendance will be sought.

N.C. Gen. Stat. § 15A-803(a). This method compels a witness to "attend the hearing by subpoena, or if the court considers it necessary, by order for arrest." N.C. Gen. Stat. § 15A-803(g). Therefore, if Webb would have filed a motion for a material witness order, McCormick could have been compelled to attend and testify at Defendant's original trial despite any interference from his mother.

Further, McCormick was actually present at Defendant's trial. Knowing this, Webb failed to speak with McCormick despite knowing that McCormick may have information concerning Graham's death. In addition, Webb failed to alert the trial court to the existence of this information, failed to file a motion to continue, request a recess, or otherwise take steps to procure the information.

In similar cases, we have rejected a defendant's motion for a new trial on the basis of newly discovered evidence when the defendant had an opportunity at trial to present the evidence through other methods, or the defendant did not use the proper procedures to preserve the evidence.

In *State v. Beaver*, the defendant was convicted of first-degree burglary and sentenced to life imprisonment. *Beaver*, 291 N.C. at 138, 229 S.E.2d at 180. The defendant filed a motion for a new trial on the basis of newly discovered evidence. The defendant argued that he learned during jury deliberations that a witness was located prior to trial, and that this witness would testify that defendant was living in the house which was burglarized. *Id.* at 142, 229 S.E.2d at 182. Our Supreme Court found that the witness' testimony "would only have been cumulative and corroborative[,]" the defendant "had ample opportunity to examine" the detectives who located the witness, and the defendant should have filed an affidavit prior to trial stating that the witness was important and material. *Id.* at 144, 229 S.E.2d at 183.

Furthermore, in *State v. Rhodes*, the defendant was convicted of possession with intent to manufacture, sell, or deliver cocaine and possession of drug paraphernalia. *Rhodes*, 366 N.C. at 534, 743 S.E.2d at 38. The defendant's father testified at trial but invoked his Fifth Amendment protections when asked whether the contraband belonged to him. *Id.* at 537, 743 S.E.2d at 40. After trial, the defendant's father made an out-of-court statement that the drugs belonged to him. *Id.* at 538, 743 S.E.2d at 40.

Our Supreme Court determined that this information was not newly discovered evidence because it "was not evidence which was unknown or unavailable to the defendant at the time of trial, which could not with due diligence have been discovered or made available at that time." *Id.* at 538, 743 S.E.2d at 40 (citation and quotation marks omitted). In making this conclusion, our Supreme Court determined that the evidence could have been presented at trial through a different line of questioning or even through the examination of another witness. *Id.* at 538, 743 S.E.2d at 40.

Accordingly, McCormick's testimony is not newly discovered evidence because it was not "unknown or unavailable to the defendant at the time of trial." *Wiggins*, 334 N.C. at 38, 431 S.E.2d at 767.

Closely related is the issue of due diligence. "Due diligence is defined as '[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks

to satisfy a legal requirement or to discharge an obligation.' " *State v. Pezzuto*, No. COA02-569, 2003 WL 21037894, at *3 (N.C. Ct. App. May 6, 2003) (quoting Black's Law Dictionary 468 (7th ed.1999)) (unpublished).

> When the information presented by the purported newly discovered evidence was known or available to the defendant at the time of trial, the evidence does not meet the requirements of N.C.G.S. § 15A-1415(c). *Wiggins*, 334 N.C. at 38, 431 S.E.2d at 767. In *State v. Powell* we found no error in a trial court's conclusion that a defendant failed to exercise due diligence when "the defendant knew of the statement of [the witness] during the trial" but failed to procure her testimony. 321 N.C. at 371, 364 S.E.2d at 336. We also agreed there was no newly discovered evidence when a defendant learned after trial that his blood sample had been destroyed before trial, yet he made no inquiry about the blood sample before or during trial. *State v. Dixon*, 259 N.C. 249, 250-51, 130 S.E.2d 333, 334 (1963) (*per curiam*). In another case we agreed there was no newly discovered evidence when the defendant learned during his trial that two detectives had located his former roommate before the trial began. *Beaver*, 291 N.C. at 144, 229 S.E.2d at 183. We wrote: "Defendant had ample opportunity to examine [the detectives] as to their knowledge of the whereabouts of [his former roommate]. This he failed to do." *Id.* We further wrote: "[I]f [the] defendant considered [the former roommate] an important and material witness, he should have filed an affidavit before trial so stating and moved for a continuance to enable him to locate this witness. This he did not do." *Id.*

*Rhodes*, 366 N.C. at 537, 743 S.E.2d at 40.

Conclusion of law 13 states that "Defendant used due diligence and proper means to procure the testimony of William McCormick at Defendant's original trial."

For the reasons stated above concerning evidence unknown to Defendant, Defendant failed to exercise due diligence in procuring McCormick's testimony.

C. Material, Competent and Relevant Information

The State further argues that the trial court abused its discretion when it concluded that McCormick's testimony and affidavit was "competent, material and relevant. [Because i]t identifies the actual perpetrators of the offense and exculpates the Defendant." We agree.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c) (2019). "Hearsay is not admissible except as provided by statute or by the[] rules" of evidence. N.C. Gen. Stat. § 8C-1, Rule 802 (2019). McCormick's testimony concerning Shaw's purported statements are inadmissible hearsay. Rule 803 of the North Carolina Rules of Evidence establishes exceptions to the general exclusion of hearsay evidence. *See* N.C. Gen. Stat. § 8C-1, Rule 803 (2019).

The trial court made the following conclusion of law concerning Shaw's statements:

> 9.      After careful scrutiny, the court concludes that the testimony of William McCormick about Robert Shaw's statement regarding the details of Shaw, Bristow and Cox assaulting the victim is admissible evidence under Rule 803(24). First, the State is on notice that Defendant would offer such evidence at trial. Second, this hearsay evidence

is not specifically covered by any other exception in Rule 803. Third, the evidence possesses circumstantial guarantees of trustworthiness equivalent to other hearsay exceptions because it constitutes an admission of criminal conduct by Shaw, is consistent with events actually observed by William McCormick the day before, when Shaw and the other youths arrived at McCormick's house out of breath having jumped and run from a cab, and is consistent with known circumstances of the case, including that the victim was assaulted by more than one young male person. Fourth, the evidence is material to the case. Fifth, the evidence is more probative on the issue of whether Shaw, Bristow and Cox, rather than Defendant, were the actual perpetrators of these crimes than any other evidence procurable by reasonable efforts. Defendant cannot reasonably be expected to procure the in-court confession of Shaw that Shaw himself is guilty of robber and first degree murder. Sixth, admission of the evidence of Shaw's statements will best serve the purposes of the Rules of Evidence and the interests of justice. *State v. Smith*, 315 N.C. 76 (1985).

Rule 803(24) of the North Carolina Rules of Evidence allows the admission of statements that are

> not specifically covered by any of the foregoing [hearsay] exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

N.C. Gen. Stat. § 8C-1, Rule 803(24). However, "Rule 803(24) is disfavored and should be invoked very rarely and only in exceptional circumstances." *Strickland v. Doe*, 156

N.C. App. 292, 299, 577 S.E.2d 124, 130 (2003) (citation and quotation marks omitted).

> Because of the residual nature of the Rule 803(24) hearsay exception and the Commentary's warning that this exception does not contemplate an unfettered exercise of judicial discretion, evidence proffered for admission pursuant to N.C.G.S. § 8C-1, Rule 803(24), must be carefully scrutinized by the trial judge within the framework of the rule's requirements.

*State v. Smith*, 315 N.C. 76, 91-92, 337 S.E.2d 833, 844 (1985) (*purgandum*).

For evidence to be admissible under Rule 803(24), the trial court must find six factors in the affirmative: (1) proper notice had been given; (2) the hearsay is not specifically covered elsewhere; (3) the statement is trustworthy; (4) the statement is material; (5) the statement is more probative on the issue than any other evidence which the proponent can procure through reasonable efforts; and (6) the interests of justice will be served by its admission. *Id.* at 92-96, 337 S.E.2d at 844-847. Defendant failed to satisfy the notice requirement, and so we address only that factor in our analysis below.

> When hearsay testimony is sought to be admitted as substantive evidence under Rule 803(24), the proponent must first provide written notice to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to prepare to meet the statement. The hearsay statement may not be admitted unless this notice (a) is in writing; and (b) is provided to the adverse party sufficiently in advance of offering it to allow him to prepare to meet it; and (c) contains (1) a statement of the proponent's intention to offer the hearsay testimony, (2) the particulars of the

hearsay testimony, and (3) the name and address of the declarant. Thus, a trial judge must make the initial determination that proper notice was duly given and must include that determination in the record; detailed findings of fact are not required. Should the trial judge determine that notice was not given, was inadequate, or was untimely provided, his inquiry must cease and the proffered hearsay statement must be denied admission under Rule 803(24).

*Id.* at 92, 337 S.E.2d at 844 (emphasis added) (quotation marks omitted).

Here, the trial court found that "the State is on notice that Defendant would offer such evidence at trial." However, there is no evidence in the record that Defendant filed a proper notice of intent to offer hearsay evidence pursuant to Rule 803(24) prior to hearing the motion for appropriate relief. Thus, Defendant failed to satisfy the first requirement of Rule 803(24), and the trial court abused its discretion when it concluded the written notice requirement had been satisfied. See *id.* at 92, 337 S.E.2d at 844 ("Should the trial judge determine that notice was not given, was inadequate, or was untimely provided, his inquiry must cease and the proffered hearsay statement must be denied admission under Rule 803(24).").

III. Constitutional Violation

The State also argues that the trial court erred when it concluded that Defendant's due process rights would be violated if he were not allowed to present McCormick's testimony at a new trial. We agree.

"The standard of review for alleged violations of constitutional rights is *de novo*. A violation of the defendant's rights under the Constitution of the United

States is prejudicial unless we find that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." *State v. Guy*, 262 N.C. App. 313, 317, 822 S.E.2d 66, 72 (2018) (*purgandum*).

The Sixth Amendment to the United States Constitution, in pertinent part, states, "[i]n criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Sixth Amendment applies to the State of North Carolina by way of the Fourteenth Amendment to the United States Constitution, which states, in part,

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV.

Rather than relying on traditional due process principles to determine whether to grant a new trial for newly discovered evidence, this Court has previously applied the seven factors required for a new trial as set forth in *Beaver*. *See State v. Hoots*, 76 N.C. App. 616, 618, 334 S.E.2d 74, 75-76 (1985) ("Defendant contends that due process requires a new trial whenever newly discovered exculpatory evidence in the form of sworn testimony by a confessed perpetrator of the offense is corroborated by

independent evidence. This contention is without merit. The standard for granting a new trial is set out in [*Beaver*.]").

Here, the trial court stated in conclusion of law 18, "In addition, as an independent ground for decision, denying Defendant the opportunity to present all of the newly discovered evidence to a trier of fact would, under the circumstances of this case, violate Defendant's federal and state constitutional rights to due process of law."

However, Defendant has failed to satisfy the *Beaver* factors discussed above, and Defendant is not entitled to a new trial. Thus, the trial court erred in concluding that Defendant's constitutional rights would be violated if he did not have the opportunity to present the purported newly discovered evidence.

## Conclusion

For the reasons stated herein, we reverse the trial court's order granting a new trial.

REVERSED.

Judge BRYANT concurs.

Judge DIETZ concurs by separate opinion.

DIETZ, Judge, concurring.

This case arrived at our Court on the wrong legal ground for post-conviction relief. When a defendant who already has been convicted of a crime claims that there is evidence of his innocence, his postconviction options branch into two paths, depending on the availability of that evidence at the time of trial.

If the evidence of innocence *could not* have been discovered in the exercise of due diligence at the time of trial, the defendant can bring a claim under N.C. Gen. Stat. § 15A-1415(c), which addresses newly discovered evidence.

By contrast, if the evidence *could* have been discovered in the exercise of due diligence at the time of trial, but was not, the defendant may pursue a claim for ineffective assistance of counsel under N.C. Gen. Stat. § 15A-1415(b)(3).

This case follows the second path. Reid's trial counsel learned "from the street" that William McCormick had information that implicated other people, but not Reid, in the crime. Reid's counsel even hired an investigator to speak to McCormick. But, according to Reid's counsel, "we couldn't get to him." This was so, Reid's counsel explained, because McCormick's mother did not want him to get involved with the investigation.

As the majority correctly observes, the law provides many options for a defendant in this situation to secure the testimony of the evasive witness. Indeed, McCormick was sitting in the courtroom during Reid's trial, yet Reid's counsel took no steps to obtain his testimony despite knowing that it likely was exculpatory. As a

result, the jury never heard the testimony that McCormick ultimately provided years later.

Still, that fact does not make McCormick's testimony, when it finally came to light, newly discovered evidence under our post-conviction jurisprudence. Rather, the failure to secure this testimony at the time of trial implicates Reid's constitutional right to the effective assistance of counsel.

I therefore concur in the majority's judgment but note that this Court's holding does not bar Reid from seeking post-conviction relief on other grounds. The procedural bar on successive motions for appropriate relief should not apply if the basis for one claim did not become apparent until the litigation of another.